# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MALAIKA BROOKS,
    *Plaintiff-Appellee,*

   v.

CITY OF SEATTLE,
     *Defendant,*

   and

STEVEN L. DAMAN, in his capacity
as an officer of the Seattle Police
Department; DONALD M. JONES, in
his individual capacity as an
officer of the Seattle Police
Department; JUAN M. ORNELAS, in
his individual capacity as an
officer of the Seattle Police
Department,
    *Defendants-Appellants.*

No. 08-35526

D.C. No.
2:06-cv-01681-RAJ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

Argued and Submitted
July 10, 2009—Seattle, Washington

Filed March 26, 2010

Before: Cynthia Holcomb Hall, Diarmuid F. O'Scannlain,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Hall;
Dissent by Judge Berzon

4913

**COUNSEL**

Karen L. Cobb and Theron A. (Ted) Buck, Stafford Frey Cooper, Seattle, Washington, for the defendants-appellants.

Eric Zubel, Eric Zubel, PC, Seattle, Washington, for the plaintiff-appellee.

---

**OPINION**

HALL, Circuit Judge:

Sergeant Steven Daman, Officer Juan Ornelas, and Officer Donald Jones (collectively "the Officers") appeal the district court's denial of the Officers' motion for summary judgment on Malaika Brooks's § 1983 and state law claims. Brooks had sued the City of Seattle, the Seattle Police Department ("SPD") and its chief, as well as the Officers, based on the Officers' alleged excessive force when they tased her three times to effect her arrest. The district court denied the Officers' motion for summary judgment,[1] finding that they were not entitled to qualified immunity for their actions. The Officers challenge that denial. This court has jurisdiction pursuant to 28 U.S.C. § 1291. We reverse.

**I.**

On November 23, 2004, SPD Officer Juan Ornelas stopped Brooks for speeding in a school zone.[2] The situation deteriorated rather quickly. Brooks claimed she had not been speed-

---

[1]The district court granted summary judgment to the City of Seattle, SPD, and the police chief on Brooks's § 1983 or state law claims.

[2]Because this appeal arises from a denial of summary judgment, we assume that the version of material facts asserted by Brooks, the non-moving party, is correct. *See Robinson v. Prunty*, 249 F.3d 862, 866 (9th Cir. 2001).

ing, took her driver's license out of Officer Ornelas's ticket book and only reluctantly gave it back, and then repeatedly refused to sign a Notice of Infraction ("Notice") regarding her speeding violation.[3] When SPD Officer Jones arrived at the scene, Officer Ornelas told him that Brooks had refused to sign the Notice and was being uncooperative. Officer Jones tried to obtain her signature himself, but Brooks also refused his entreaties, despite assurances that signing was not tantamount to admitting the violation. She accused Officer Jones of lying to her about the import of signing,[4] suggested he was being racist, and became upset, repeating "I'm not signing, I'm not signing" over and over. Throughout, she remained in the car with the ignition running.

---

[3]The Notice of Infraction gives notice that a traffic law has been violated and requires a signature indicating, without admitting to the crime, that the recipient will respond as directed by the Notice. *See* Wash. Rev. Code § 46.63.060. The Notice should be distinguished from a Citation to Appear, which is a separate document that includes the violation allegedly committed, but requires a signature promising to appear in court. *See* Wash. Rev. Code § 46.64.015.

There is considerable dispute as to whether the Officers gave Brooks both a Notice based upon her speeding and violation and a Citation to Appear based upon her refusal to sign the Notice. Officer Jones maintains that he asked Brooks about both the Notice and the Citation to Appear. Sergeant Daman claims he was also asking about both when he asked Brooks if she would sign "the ticket." Confusing matters, the Notice and the Citation to Appear are frequently referred to by all parties interchangeably as "tickets" or "citations" even though the penalty for refusing to sign them is quite different. Nonetheless, Brooks maintains that she thought the "ticket" she was being asked to sign here was still the Notice. This panel must view the facts in the light most favorable to her and assume she did not refuse to sign the Citation to Appear.

[4]Brooks has had a previous encounter with Notices and Citations to Appear. During a 1996 traffic incident, she refused to sign both the Notice and the Citation to Appear because she did not think she was guilty of the traffic offense underlying the Notice. In that case, the ticketing officer's supervisor instructed the officer to give Brooks both tickets and allow her to leave, even though the law would have permitted custodial arrest.

Officer Ornelas then called his supervisor, SPD Sergeant Daman. When Sergeant Daman arrived, Brooks continued to refuse to sign the Notice. Sergeant Daman then asked her "if [she] was going to sign the ticket." When she refused, he told Officers Ornelas and Jones to "[b]ook her." They attempted to follow those orders.

Brooks refused to leave her car, remaining in it with the ignition running and her door shut. Officer Jones then showed Brooks his Taser, explaining that it would hurt "extremely bad" if applied. Brooks told them she was pregnant and that she needed to use the restroom. The officers discussed where to tase her, deciding on her thigh. Officer Jones demonstrated the Taser for her. Brooks still remained in the car, so Officer Ornelas opened the door and reached over to take the key out of the ignition, dropping the keys on the floorboard.[5]

Officer Ornelas then employed a pain compliance technique, bringing Brooks's left arm up behind her back, whereon Brooks stiffened her body and clutched the steering wheel in order to frustrate her removal from the car. Officer Jones discharged the Taser against Brooks's thigh, through her sweat pants, which caused Brooks "tremendous pain." She began to yell and honk the car's horn.

Within the next minute, Officer Jones tased her two more times, against her shoulder and neck, the latter being the only area of exposed skin. Brooks was unable to get out of the car herself during this time because her arm was still behind her back.[6] The third tasing moved Brooks to the right, at which point Officers Ornelas and Jones were able to extract her from

---

[5]The district court mistakenly found that the keys remained with Officer Ornelas. Brooks herself says otherwise.

[6]The district court suggests the Taser stun may have made her unable to leave, but that is not consistent with Brooks's declaration, which links her inability to move with her arm being held behind her back rather than any muscle lock-up.

the car through a combination of pushing and pulling. She was immediately seen by medical professionals, and two months later delivered a healthy baby.

Brooks was charged with (1) violation of Seattle Municipal Code 11.59.090 for refusing to sign the Notice, and (2) resisting arrest. She was convicted of the first charge, but the jury hung on the second, which was later dismissed.

Brooks then filed this action against the Officers, asserting a claim under 42 U.S.C. § 1983 and assault and battery claims under state tort law for the alleged excessive force. The district court denied the Officers' motion for summary judgment on those claims, finding a clearly established constitutional violation that deprived the Officers of qualified immunity on both the federal and state claims.

## II.

We review de novo a denial of summary judgment based on qualified immunity. *See Lee v. Gregory*, 363 F.3d 931, 932 (9th Cir. 2004). Our review is limited to the question of whether, assuming all conflicts in the evidence are resolved in Brooks's favor, the Officers would be entitled to qualified immunity as a matter of law. *Id.*

## III.

Qualified immunity entitles the Officers "not to stand trial or face the other burdens of litigation" on the § 1983 claim, provided their conduct did not violate a clearly established federal right. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The qualified immunity inquiry asks two questions: (1) was there a violation of a constitutional right, and, if so, then (2) was the right at issue "clearly established" such that it would have been clear to a reasonable officer that his conduct was unlawful in that situation?[7] *See Saucier v. Katz*, 533 U.S. 194,

---

[7]After *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009), we have discretion to decide which step to address first.

201-02 (2001), *overruled on other grounds by Pearson v. Callahan*, 129 S. Ct. 808 (2009). If the Officers' actions do not amount to a constitutional violation, the violation was not clearly established, or their actions reflected a reasonable mistake about what the law requires, they are entitled to qualified immunity. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007).

### A.    Constitutional Violation

In her complaint, Brooks alleged that the Officers violated her constitutional rights by using excessive force during her arrest.

### 1.    Probable Cause

Beginning in her opposition to the Officers' motion for summary judgment, Brooks has argued that the Officers did not have probable cause to arrest her for refusing to sign the Citation to Appear because she did not so refuse. Therefore, she contends, there was no need for force, and any force used was constitutionally unreasonable. *See Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1204 (9th Cir. 2000). As an initial matter, we note that "establishing a lack of probable cause . . . does not establish an excessive force claim," *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004). Thus, the result, even if we were to find no probable cause, is not as obvious as Brooks would make it. Indeed, an arrestee's resistance may support the use of force regardless of whether probable cause existed. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (finding an arrestee's actions in "stiffen[ing] her arm and attempt[ing] to pull it away" to be resistance justifying the officer's use of force in handcuffing regardless of whether there was probable cause to arrest her).

**[1]** Nonetheless, the existence of probable cause may be considered as a part of the totality of circumstances affecting

the excessive force analysis. *See Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) (permitting consideration of whether the officer's conduct "violated applicable police standards" in assessing the reasonableness of the force used). It also impacts the question of state law immunity on the assault and battery claims. *See* Wash. Rev. Code § 9A.16.020(1) (finding force used by a police officer not unlawful "[w]henever necessarily used . . . in the performance of a legal duty"); *Staats v. Brown*, 991 P.2d 615, 627-28 (Wash. 2000) (describing state qualified immunity on assault and battery as dependent upon whether the force used to effect the arrest was excessive). Thus, we consider whether the Officers had probable cause to arrest Brooks.

[2] "Probable cause exists when the facts and circumstances within the officer's knowledge are sufficient to cause a reasonably prudent person to believe that a crime has been committed." *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1053 (9th Cir. 2009). Though we agree with the district court that the Officers did have probable cause to arrest Brooks, we arrive at that conclusion by a different path.[8]

[3] Brooks concedes that she refused to sign the Notice, which amounted to a violation of Seattle Municipal Code § 11.59.090(c). For the purposes of the Fourth Amendment, this is sufficient to find probable cause. *See Virginia v. Moore*, 128 S. Ct. 1598, 1606-07 (2008) (holding that an arrest based on probable cause does not violate the Fourth Amendment, even if the relevant criminal offense is non-arrestable under state law).

However, because *Virginia v. Moore* does not answer the

---

[8]The district court found probable cause based on statutory authority to arrest for the refusal to sign a *Citation to Appear*, *see* Wash. Rev. Code § 46.64.015, but then referenced Brooks's "undisputed refusal to sign the *Notice*." Recognizing Brooks's contentions that she did not refuse to sign the Citation to Appear, our analysis is different.

question of whether the Officers were following departmental standards or are entitled to state law immunity, we march on. Brooks's arguments are all based on the premise that (1) she could not be arrested for refusing to sign the Notice and (2) although she could be arrested for refusing to sign the Citation, she never received it. However, she does not argue that she was detained longer than was reasonably necessary under Section 46.64.015 or that her conduct during that period of detention could not provide grounds for lawful arrest.

**[4]** First, the Officers had clear authority for their initial arrest and detention of Brooks. Brooks does not dispute that her initial traffic violation permitted the Officers to arrest and to detain her until they issued her a Notice. *See* Wash. Rev. Code § 46.64.015 (2004) ("The arrested person, in order to secure release, and when permitted by the arresting officer, must give his or her written promise to appear in court as required by the citation and notice by singing in the appropriate place . . .").[9] In addition, Brooks's refusal to sign the Notice gave the Officers probable cause to continue to detain her. Under Washington law, a police officer may arrest an individual for committing a misdemeanor in his presence. Wash. Rev. Code § 10.31.100. Failure to sign the Notice is a misdemeanor. *See* Wash. Rev. Code § 46.61.022 (making failure to comply with Wash. Rev. Code § 46.61.021(3), which includes a requirement to sign the Notice, a misdemeanor). As there is no dispute that Brooks's refusal to sign the Notice took place in the presence of the Officers, there can be no question that Washington law authorized her arrest.

**[5]** The Officers' authority to arrest Brooks for these misdemeanors would ordinarily last no longer than necessary to issue her a Citation. *See* Wash. Rev. Code § 46.64.015 (2004).

---

[9]In 2006, the Washington legislature amended this statute to omit the authorization to effect a custodial arrest for failure to sign the Citation to Appear. *See* Wash. Rev. Code § 46.64.015. However, the earlier version was applicable to the events of this case.

However, her conduct during this initial detention gave the Officers probable cause to place her under custodial arrest for other violations of state law—a point that Brooks does not dispute. For instance, we find that probable cause existed to arrest Brooks for obstructing an officer. *See* Wash. Rev. Code § 9A.76.020. "A person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties." *Id.*; *see Lassiter*, 556 F.3d at 1051, 1053 (listing the crime's elements as "1) an action or inaction that hinders, delays, or obstructs the officers; 2) while the officers are in the midst of their official duties; 3) the defendant knows the officers are discharging a public duty; [and] 4) the action or inaction is done knowingly"). That violation is a gross misdemeanor for which custodial arrest is appropriate. *See* Wash. Rev. Code §§ 9A.76.020(3), 10.31.100. While trying to obtain Brooks's signature on the Notice, the officers were acting in the discharge of their official duties. *See* Wash. Rev. Code §§ 46.61.021, 46.63.060(2)(j) (official duties when completing and issuing Notice, which requires signature); *State v. Richards*, 36 P.3d 1119, (Wash. 2001) (official duties when seeking signature on Citation to Appear).

**[6]** Based on Brooks's undisputed uncooperative behavior, a reasonably prudent person would have believed Brooks was violating section 9A.76.020 by obstructing the Officers' attempts to obtain her signature and complete the traffic stop. Wash. Rev. Code § 9A.76.020(1); *see Lassiter*, 556 F.3d at 1053 (finding probable cause to arrest an individual for obstructing a police officer when that individual declined to follow instructions and grabbed the officer's arm when the officer placed a hand on him). The record reflects that Brooks's detention was lengthened and the situation escalated by her own resistance. The Officers were attempting—and Brooks knew they were attempting—to complete and issue the Notice by securing her signature on it as required by sections 46.61.021 and 46.63.060(2)(j). Her behavior interfered

with their lawful attempts to carry out that duty. Therefore, the Officers had probable cause to arrest Brooks.

Additionally, Washington state courts have recognized that although officers generally should issue citations for minor traffic violations instead of making custodial arrests, there might be "reasonable grounds" for making an arrest, such as when "there was reasonable grounds to believe that the accused will refuse to respond to a citation." *State v. Hehman*, 578 P.2d 527, 528-29 (Wash. 1978); *see State v. Covington*, 144 Wash. App. 1012 (Wash. Ct. App. 2008) (finding it reasonable to believe that person without identification, claiming not to own the vehicle he was driving, would disregard a promise to appear on the citation if one were given); *State v. Jordan*, 747 P.2d 1096, 1098 (Wash. Ct. App. 1987) (same); *State v. McIntosh*, 712 P.2d 319 (Wash. Ct. App. 1986) (same and defendant also gave suspicious account of his activity on evening of arrest).

**[7]** Even if Brooks never in fact received the Citation, her conduct while in detention for the speeding violation and failure to sign the Notice made it reasonable to believe that she also would not sign a Citation were one issued. Brooks has admitted being uncooperative during her detention: she tried to take her driver's license away from Officer Ornelas; repeatedly refused his requests to sign the Notice; repeatedly refused Officer Jones's requests to do the same, even when told it was her legal duty to sign; accused Officer Jones of lying to her about the law and of racism; and became upset, all while sitting in her car with the ignition running. Officer Ornelas called for backup because of her behavior. When Sergeant Daman arrived at the scene, he asked her again to sign, and she refused. Under these particular circumstances, it would be reasonable to believe that serving Brooks the Citation would be futile. Therefore, even if Brooks's account of the incident were true, the futility of issuing the Citation would provide the Officers probable cause to arrest her for failure to sign the Notice.

## 2. Excessive Force

**[8]** An excessive force claim is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). This inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). Because reasonableness "is not capable of precise definition or mechanical application," the inquiry requires "attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* These factors should be considered in relation to the amount of force used. *See Smith*, 394 F.3d at 701. Reasonableness is judged from the perspective of a reasonable officer on the scene, making allowances for the split-second judgments officers are required to make in "tense, uncertain, and rapidly-evolving" situations. *Graham*, 490 U.S. at 396-97.

The right to employ "some degree of physical coercion or threat thereof" to effect an arrest accompanies the right to make the arrest or investigatory stop, *id.* at 396, but the force must be necessary to be reasonable, *Blankenhorn*, 485 F.3d at 480. Where police have control over a suspect, the use of further force to bring the suspect under control may be unreasonable. *See Headwaters Forest Def.*, 276 F.3d at 1125 (use of pepper spray on protesters already under police control held excessive). Officers are not required to use the least intrusive means available; they simply must act within the range of reasonable conduct. *See Scott v. Heinrich*, 39 F.3d 912, 915 (9th Cir. 1994). Determination of that reasonable range requires consideration of the totality of the circumstances, *Forrester v. City of San Diego*, 25 F.3d 804, 806 n.2 (9th Cir. 1994), including whether a warning was given, *Deorle v. Rutherford*, 272 F.3d 1272, 1283-84 (9th Cir. 2001), and the availability

of alternative methods of capturing and subduing a suspect, *Smith*, 394 F.3d at 701-02. The fact that a suspect does not threaten the officer does not shield him from the use of force. *See Forrester*, 25 F.3d at 807-09 (finding no Fourth Amendment violation when officers used injury-causing pain compliance techniques on passively resisting demonstrators).

The Officers argue that the use of a Taser to gain Brooks's compliance—after previous unsuccessful, lawful attempts to gain her cooperation and warnings the Taser would be used—was not objectively unreasonable. The Officers note that a Taser's use in "drive-stun" mode inflicts only transitory, localized pain. Applying the *Graham* factors, the Officers first claim that the alleged crime was the more serious crime of resisting arrest, not the failure to sign the Notice. Second, they contend that, although Brooks initially posed only a minimal risk, that risk escalated when she became confrontational and refused to leave her running car. Third, and finally, they point out that Brooks was actively resisting arrest by using force to immobilize herself and remain in the car.

### a.   The Amount of Force

We first assess the quantum of force used by the Officers. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007). The Officers claim there has been a significant misunderstanding of the force involved in the manner in which the Taser was used here. We are inclined to agree.

[9] The Taser's use in "touch" or "drive-stun" mode—as the Officers used it here—involves touching the Taser to the body and causes temporary, localized pain only. According to the SPD's Use of Force Training Guideline,[10] this usage was

---

[10]SPD's policies, found constitutional by the district court, state that officers must only use "the minimal amount of force necessary to overcome physical aggression or resistance to compliance with a lawful process." The Use of Force Training Guideline provides context for that general statement, presenting a continuum describing the suspect's level of resistance and the corresponding reasonable force which may be used to react to that resistance.

considered a Level 1 tactic, akin to "pain compliance applied through the use of distraction, counter-joint holds, hair control holds, [and pepper spray]" and used to control passively or actively resisting suspects. By contrast, applying a Taser in dart mode (wherein darts are shot at the suspect from some distance) achieves greater distance between the contact nodes which can cause neuro-muscular incapacitation. In dart mode, the Taser's use is a Level 2 tactic to be employed only against aggressive resistance. The district court did not differentiate between the possible modes of use, noting only that the Taser was discharged on Brooks's thigh, shoulder, and neck, causing "a level of force (whether once or three times) that hurt 'extremely bad,' " and constituted a "quantum leap" from the previous force employed. These comments suggest the district court thought the force used was severe. We find this to be an overestimation that led the court to err in finding excessive force.

In two recent decisions, we addressed excessive force claims involving the use of Tasers. *See Mattos v. Agarano*, 590 F.3d 1082 (9th Cir. 2010) (per curiam) (holding that the use of a Taser stun on a suspected domestic violence victim while attempting to arrest her husband did not amount to excessive force); *Bryan v. McPherson*, 590 F.3d 767 (9th Cir. 2009) (holding that shooting a Taser gun at a disoriented, half-naked man while stopping him for a seatbelt violation constituted excessive force).

The *Mattos* court did not engage in an in-depth analysis of the quantum of force involved in the use of a Taser. *See* 590 F.3d at 1087 ("[I]t is difficult for us to opine with confidence regarding either the quantum of force involved in a deployment of a Taser gun or the type of force inflicted."). In *Mattos*, a police officer applied a Taser directly to plaintiff's back, causing her to feel "an incredible burning and painful feeling locking all of [her] joints." *Id.* at 1085 (internal quotation marks omitted; alteration in original). The panel, however, cited conflicting testimony regarding the amount of force used

and the severity of plaintiff's injuries. *Id.* at 1087. It observed that "the Taser, in general, is more than a non-serious or trivial use of force but less than deadly force," and noted that "[u]nfortunately, there is a lot of room between these end points." *Id.* The panel noted that "the record on this point is not as developed as we could hope for," but concluded that "the Taser stun was a serious intrusion into the core of the interests protected by the Fourth Amendment."[11] *Id.* The *Mattos* panel did not differentiate drive-stun and dart modes, nor did it differentiate the quantum of force used on Mattos from the quantum of force used in *Bryan*.

The *Bryan* panel undertook a more detailed analysis of the quantum of force. The panel concluded that the use of a Taser, in a manner equivalent to dart mode, "constitute[s] an intermediate, significant level of force that must be justified by a strong government interest that *compels* the employment of such force." *Bryan*, 590 F.3d at 774 (internal quotation marks omitted).[12] In *Bryan*, a police officer discharged his X26 Taser from a distance of approximately 20-25 feet, embedding a barbed electrical probe into Bryan's arm. *Id.* at 771. The X26's powerful electrical pulse delivered an excruciating pain throughout Bryan's body and caused Bryan to lose all muscular control, fall face first onto the pavement, shatter four front teeth, and suffer facial abrasions and swell-

---

[11]Although the *Mattos* panel appears to accept that the Taser was deployed in drive-stun mode, *see* 590 F.3d at 1087 ("[D]efendant's expert conceded that a Taser in the drive stun mode induces subject control through pain compliance . . ." (internal quotation marks omitted)), Mattos's description of a generalized loss of muscle control is more indicative of a Taser in dart mode. She also claims to have "removed the Taser's prongs herself," *id.*, another characteristic of dart mode.

[12]The holding in *Bryan* applied to the X26 Taser model and "all controlled electric devices that cause similar physiological effects." *See Bryan*, 590 F.3d at 772 n.2. Although this would clearly implicate the use of a Taser in dart mode—which has similar physiological effects as the X26—the localized, non-incapacitating effect of the drive-stun mode has markedly different physiological effects.

ing. *Id*. He also needed to have the electrical barb surgically removed from his flesh. *Id*. at 773. Because the pain inflicted by the X26 Taser was "intense, [was] felt throughout the body, and [was] administered by effectively commandeering the victim's muscles and nerves," we held the X26 Taser to be "an intermediate or medium, though not insignificant, quantum of force." *Id*. at 774-75.[13]

[10] The force at issue here is markedly different than the force in *Bryan*, and, unlike in *Mattos*, we have the benefit of a fully-developed record on the use of a Taser in drive-stun mode. The use of the Taser in drive-stun mode is painful, certainly, but also temporary and localized, without incapacitating muscle contractions or significant lasting injury. Brooks said she sustained burn marks and now has scars on her upper arm and thigh, which is certainly not insignificant, but these injuries are far less serious than those inflicted on Bryan by the X26 Taser—excruciating pain throughout his entire body, temporary paralysis, facial abrasions, shattered teeth, and a sharp barb lodged into his flesh. Thus, the use of the Taser in drive-stun mode—as opposed to dart mode—seems unlike the force used in *Bryan* or uses of force which this court has previously considered severe. *See, e.g.*, *Davis*, 478 F.3d at 1055 (holding that the force used was "extremely severe" when officer slammed suspect head-first into the wall, breaking his neck, then pressed to the ground by the officer's knee and punched); *Smith*, 394 F.3d at 701-02 (severe when officers pepper sprayed suspect four times and sicced a police dog on him three times while he was pinned down, then failed to rinse the spray from his eyes and bite wounds). Indeed, the

_____

[13]Other circuit and district court decisions have also found the Taser dart application to be an intermediate amount of force. *See, e.g.*, *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004); *Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1168 (E.D. Cal. 2008) (citing cases). *But see Parker v. Gerrish*, 547 F.3d 1, 10 (1st Cir. 2008) (finding a jury could have found a Taser dart application unreasonable in light of testimony about its "strong incapacitating effect" and the fact that the police department considered it just below deadly force on the force continuum).

amount of force here was more on par with pain compliance techniques,[14] which this court has found involve a "less significant" intrusion upon an individual's personal security than most claims of force, even when they cause pain and injury. *Forrester*, 25 F.3d at 807 (considering pain compliance techniques that caused bruises, pinched nerves, and a broken wrist). Although certainly a "serious intrusion," *Mattos*, 590 F.3d at 1087, when compared to the far more serious intrusion in *Bryan*, we find the quantum of force here to be less than the intermediate.[15]

### b.   The *Graham* Factors

### i.   Severity of the Crime

**[11]** Brooks was detained for refusing to sign her name on the Notice. The Officers were attempting to take her into custody for refusing to sign the Citation to Appear (albeit erroneously, under the facts as Brooks states them). Neither of these crimes were serious. As discussed above, *see supra* Part III.A.1, Brooks's behavior also gave the Officers probable cause to arrest her under Washington Revised Code § 9A.76.020(1) for obstructing a police officer in the exercise of his official duties. This court has held that in certain cir-

---

[14]The use of a Taser in drive-stun mode is considered a pain compliance technique both by the SPD's Use of Force Training Guideline and our jurisprudence. *See San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 969 n.8 (9th Cir. 2005).

[15]Three recent, out-of-circuit cases involved the use of a Taser in drive-stun mode, but none specifically address the quantum of force represented by that usage. *See Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009); *Orem v. Rephann*, 523 F.3d 442 (4th Cir. 2008); *Davenport v. Causey*, 521 F.3d 544 (6th Cir. 2008). We do not hold that the use of a Taser in drive-stun mode can never amount to excessive force, but solely that such use was not excessive based upon Brooks's conduct. *Cf. Brown*, 574 F.3d at 498 (concluding that a material issue of fact existed as to excessive force where officer applied Taser to frightened motor vehicle passenger speaking to a 911 operator on her cell phone).

cumstances, obstruction of an officer can justify the use of a Taser. *See Mattos*, 590 F.3d at 1087-88 (concluding that plaintiff's obstruction of her husband's arrest made it more likely that her husband would assault the officers). Although obstructing an officer is a more serious offense than the traffic violations,[16] it is nonetheless not a serious crime. *See id.*; *Davis*, 478 F.3d at 1055. This factor weighs in favor of finding the force excessive.

### ii.  Threat Posed to Officers or Bystanders

**[12]** The threat posed is the most significant *Graham* factor. *See Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). The district court found that Brooks posed no danger to the public or officers because she never used or threatened force against the Officers (using it only to immobilize herself) and could not have hurt anyone with her car. The last point stems from the court's misunderstanding of the record; even Brooks admits that the keys remained on the floorboard of her car and were *not* in the Officers' possession. Whether the keys were on the floorboard or in the Officers' possession, it seems clear that Brooks was not going to be able to harm anyone with her car at a moment's notice. Nonetheless, some threat she might retrieve the keys and drive off erratically remained, particularly given her refusal to leave the car and her state of agitation.

**[13]** It would also be incorrect to say Brooks posed *no* threat to officers. While she might have been *less* of a threat because her force so far had been directed solely at immobilizing herself, a suspect who repeatedly refuses to comply with instructions or leave her car escalates the risk involved for officers unable to predict what type of noncompliance

---

[16]Obstruction of an officer is a gross misdemeanor, Wash. Rev. Code § 9A.76.020, while refusing to sign either the Notice or Citation to Appear is a misdemeanor, Wash. Rev. Code §§ 46.61.021(1) (2004); *id.* § 46.61.022 (2009).

might come next. A contemporaneous statement by Officer Jones confirms this fear. That Brooks remained in her car, resisting even the pain compliance hold the Officers first attempted, also reveals that she was not under their control. Finally, the Washington legislature's action in making obstructing an officer a gross misdemeanor for which custodial arrest is appropriate suggests that Brooks posed the sort of threat that it was appropriate to remove from the streets. *See* Wash. Rev. Code §§ 9A.76.020(3), 10.31.100. Therefore, Brooks may not have posed a great threat, she did pose some threat by virtue of her continued non-compliance, which weighs against finding the less-than-intermediate force excessive.

### iii.    Resistance to Arrest and Risk of Flight

**[14]** Though the risk of flight, as described above, was present but small, there is little question that Brooks resisted arrest: the district court noted she "does not deny that she used force to resist the [O]fficers' efforts," she grasped the steering wheel and wedged herself between the seat and steering wheel, and she refused to get out of the car when asked. Brooks's conduct was defined by the SPD Use of Force Training Guideline as "actively resistant" because she employed force to defeat the Officers' attempts to control her. Our precedent also classifies Brooks's conduct as active resistance. *See Chew*, 27 F.3d at 1442 (hiding and fleeing is resisting arrest and offering physical resistance to an officer's efforts constitutes a greater level of active resistance). While Brooks's resistance may not have been violent or aggressive, those aspects are more relevant to the second *Graham* factor, leaving the fact of her resistance here to weigh against finding the force used excessive.

### c.    Totality of the Circumstances

In addition to the *Graham* factors described above, a consideration of the totality of the circumstances may look to

other factors as well. *See Forrester*, 25 F.3d at 806 n.2. The district court posited that the Officers could have controlled Brooks with "less violence." The availability of alternative methods is a proper factor to consider, *Smith*, 394 F.3d at 701, but it is unclear just how much it should be considered, given that "the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them," *Scott*, 39 F.3d at 915. Some cases speculate as to available alternatives, *see Davis*, 478 F.3d at 1056, while others look to expert testimony and departmental determinations as to whether less intrusive methods were available, *see id.*; *Smith*, 394 F.3d at 703, and still others eschew hypothetical arguments about whether officers could have used methods less painful or injurious as being part of an impermissible after-the-fact analysis, *see Forrester*, 25 F.3d at 807-08 & n.4; *cf. Billington v. Smith*, 292 F.3d 1177, 1188-89 (9th Cir. 2002) (recognizing that expert evidence about less intrusive alternatives does not determine reasonableness).

**[15]** We agree with the *Forrester* panel here: the district court's general and vague statement that there were "numerous other means of removing" Brooks reflects after-the-fact speculation and fails to address what else these officers could have done in the situation that confronted them at that moment, when they needed to get the resistant Brooks out of the car to arrest her. Furthermore, this case is unlike *Smith* and *Davis*, where there was evidence suggesting it would have been reasonable to use less force. Here, there has been no departmental determination that the Officers could have used alternative methods. Indeed, the Officers followed the SPD's Use of Force Training Guideline, applying pain compliance techniques (of which drive-stun Taser use was one) to control an actively resisting suspect.[17] It is true that two other

---

[17]The district court concluded the Officers did not follow SPD policy. The court did not elaborate, but may have been referring to a violation of the general statement that officers "shall only use the minimal amount of force necessary to overcome . . . resistance to compliance." Nonetheless,

pain compliance methods would have also been appropriate under the policy in light of Brooks's conduct—hair control holds and pepper spray—but there is no indication those would have been less intrusive or worked better, particularly given that Brooks had already resisted one pain compliance hold and, as a large woman, had proved difficult to dislodge. Also the pepper spray's effects would have lasted longer. *See LaLonde v. County of Riverside*, 204 F.3d 947, 960-61 (9th Cir. 2000) (describing pepper spray effects as lasting up to forty-five minutes). We thus find the "availability of alternatives" factor does not weigh in favor of finding the Officers' actions unreasonable.

**[16]** Other factors we have considered also weigh against finding a constitutional violation. The Officers gave multiple warnings that a Taser would be used and explained its effects. *See Deorle*, 272 F.3d at 1284 (finding that warnings should be given, when feasible, before force more serious than that employed here is used); *see also Bryan*, 590 F.3d at 780 (considering the failure to give a warning as a factor militating against the reasonableness of X26 Taser usage). While the court may consider what the officers knew about a suspect's health, *see Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994), the record indicates that, when the Officers discovered Brooks's pregnancy, they took steps to employ a localized type of force away from her stomach. Brooks's arrest was supported by probable cause under Washington law and the Officers' use of force was in accordance with the SPD's Use of Force Training Guideline. *See Smith*, 394 F.3d at 703 (considering whether the officer's conduct "violated applicable police standards" in assessing the reasonableness of the force

---

that statement should be read in context with the Use of Force Training Guideline, which spells out what force would be appropriate in response to certain levels of non-compliance. The Officers' Taser use was consistent with that Guideline. The district court found the SPD's use-of-force policy constitutional.

used). These factors thus mitigate against a finding of excessive force.

**[17]** The Taser was used three times in this case, which constitutes a greater application of force than a single tasing. Nonetheless, in light of the totality of the circumstances, this does not push the use of force into the realm of excessive. After the first use, Brooks did not communicate that she was willing to comply with the Officers' commands, but instead started yelling and honking her horn, which would likely have been perceived by the Officers as an escalation of her resistance. The same behavior followed the second tasing. The third tasing moved Brooks to the right, at which point Officers Ornelas and Jones were able to extract her from the car. Therefore, while using the Taser three times makes this a closer case, we find that it does not show excessive force in light of the corresponding escalation of Brooks's resistance and the fact that it was the third tasing that appeared to dislodge her such that the Officers could finally extract her from her car and gain control over her.

**[18]** In conclusion, then, this case presents a less-than-intermediate use of force, prefaced by warnings and other attempts to obtain compliance, against a suspect accused of a minor crime, but actively resisting arrest, out of police control, and posing some slight threat to officers. In this situation, we find, assuming all the facts in Brooks's favor, that the Officers' behavior did not amount to a constitutional violation. *See Arpin*, 261 F.3d at 921-22 (finding no excessive force when physical force was used to handcuff suspect who had refused to cooperate with an officer's requests for identification and stiffened her arm and attempted to pull free from the officer); *Forrester*, 25 F.3d at 807-08 (9th Cir. 1994) (finding no excessive force when injury-causing pain compliance holds were used against passively resisting demonstrators); *see also Draper*, 369 F.3d at 1278 (finding no excessive force when officer used Taser gun to effect the arrest of an

uncooperative suspect for a traffic violation). Therefore, the Officers are entitled to qualified immunity.[18]

## IV.

[19] Because the district court found that the Officers' conduct amounted to excessive force, it declined to find qualified immunity for the Officers on Brooks's state law claims. *See Staats*, 991 P.2d at 627-28 (holding that immunity is not available for assault and battery claims "arising out of the use of excessive force to effectuate an arrest"). However, because we find the Officers' use of force reasonable and not excessive under the Fourth Amendment, we reach the issue. Under Washington law, force used by a police officer is not unlawful "[w]henever necessarily used . . . in the performance of a legal duty." Wash. Rev. Code § 9A.16.020(1). Where the use of force is reasonable, an officer is entitled to state law qualified immunity for assault and battery claims. *See McKinney v. City of Tukwila*, 13 P.3d 631, 641 (Wash. App. 2000). As discussed above, the Officers had probable cause under Washington law to arrest Brooks for obstructing an officer in

---

[18]In light of our holding, we need not reach the second step of *Saucier*'s qualified immunity inquiry. However, were we to conclude that the force used was excessive, Brooks has not shown that the use of a Taser in drive-stun mode in overcoming her resistance to arrest violated a clearly established constitutional right. The shortage of cases regarding this sort of Taser usage, the Officers' adherence to the SPD's Use of Force Training Guidelines, and the likely factual misunderstanding between the parties as to what document Brooks had refused to sign all suggest that a reasonable officer would not have known he was violating the law. *See Mattos*, 590 F.3d at 1089-90 (noting the lack of relevant case law involving Tasers at the time of the incident, and concluding that "the officers' conduct was not so patently violative" of plaintiff's constitutional rights that a reasonable officer would know the action was unconstitutional) (citations omitted); *see also Saucier*, 533 U.S. at 205-06 (holding that officers should not be held to have violated the Constitution if they had a reasonable, but mistaken, belief as to whether the force used was legal in those circumstances), overruled on other grounds by *Pearson v. Callahan*, 129 S. Ct. 808 (2009).

the exercise of his official duties, did so at the behest of the superior officer on the scene, and acted reasonably and in accordance with the SPD's Use of Force Training Guideline. Thus, the Officers are entitled to immunity for these state law claims.

## V.

For the reasons discussed above, we **REVERSE** the district court and **REMAND** for proceedings consistent with this opinion.

---

BERZON, Circuit Judge, dissenting:

I dissent.

Here is what happened to Malaika Brooks, a pregnant mother, as she was driving her son to school one day: Two, soon three, police officers surrounded her. The officers thought she was speeding in a school zone; she says she was not. Brooks provided her identification when asked, so there was no doubt who she was or where to find her. The officers wrote her a ticket but she refused to sign it. Refusing to sign a speeding ticket was at the time a nonarrestable misdemeanor; now, in Washington, it is not even that.[1] Brooks had no weapons and had not harmed or threatened to harm a soul. Although she had told the officers she was seven months pregnant, they proceeded to use a Taser on her, not once but three times, causing her to scream with pain and leaving burn marks and permanent scars.

I fail utterly to comprehend how my colleagues are able to

---

[1] In 2006, the Washington legislature amended the relevant statutes to remove the requirement that the recipient of a notice of infraction sign the notice. *See* 2006 Wash. Legis. Serv. Ch. 270 (H.B. 1650).

conclude that it was objectively reasonable to use *any* force against Brooks, let alone three activations of a Taser, in response to such a trivial offense. Obviously, the sensible reaction to her refusal to acknowledge the ticket in writing would have been to so note on the ticket and send her on her way. Instead, a traffic offense — assuming it occurred — turned into an encounter that inflicted physical and, in all likelihood, emotional pain on a citizen who was not in any way dangerous to anyone. As "the situation here was far from that of a lone police officer suddenly confronted by a dangerous armed felon threatening immediate violence," *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001), we should be holding the force used constitutionally excessive. But the majority does the opposite: it sanctions the use of painful force causing permanent scars against a citizen who threatened no harm. I have no choice but respectfully to dissent.

## I.   Background

As the majority's fact recital glosses over some critical facts, I begin by supplementing it briefly.

Malaika Brooks was driving her eleven-year-old son to school at the African American Academy when she was stopped for speeding in a school zone.[2] She gave the officer her license and told her son to get out of the car and go to school. The officer, Officer Ornelas, prepared a notice of infraction and asked Brooks to sign it. Convinced it was not she but the driver in front of her who had been speeding, Brooks told Officer Ornelas she would not sign the ticket because she did not want to admit fault. She also grabbed her driver's license from Officer Ornelas but gave it back after he told her he still needed it.

---

[2]The ticket reports that she was driving 32 miles per hour, while the posted speed limit was 20 miles per hour.

The other officer on the scene, Officer Jones, then also asked Brooks to sign the ticket. She told him she would accept the ticket but would not sign it, because she had not been speeding. They began to argue: Officer Jones told Brooks that signing the ticket was not an admission of guilt and asked whether she could read. Brooks told Officer Jones that she believed, based on past experience, that he was lying about what it meant to sign the ticket, and that he was racist for suggesting she could not read.[3]

The Officers allege that they also issued Brooks a criminal citation and notice to appear because she would not sign the notice of infraction and that she refused to sign that as well. Brooks maintains she was only asked to sign the notice of infraction. For purposes of this appeal, we are required to view the facts in the light most favorable to Brooks, the non-moving party, and so, as the majority recognizes, must assume she was never asked to sign a criminal citation.

Officer Jones told Brooks she would have to go to jail if she did not sign the ticket. He called his sergeant, Sergeant Daman, who soon arrived on the scene.[4] Sergeant Daman asked Brooks whether she would sign the ticket. When she would not, he instructed Officers Ornelas and Jones to "book her." In response, Officer Ornelas told Brooks to get out of the car. She refused. Officer Jones then produced his Taser. He yelled at Brooks, asking her if she knew what the Taser was, how many volts it had, and what it could do to her. She told him she did not. She also told him that she was seven months pregnant and needed to use the restroom.

---

[3]Several years earlier, Brooks had been cited for disregarding a stop sign displayed by a school bus. Believing she was not guilty, Brooks refused to sign the notice of infraction. She was then issued a criminal citation for refusing to sign the notice; she also refused to sign the criminal citation. The arresting officer called her supervisor, who instructed the officer simply to give Brooks both tickets and allow her to leave.

[4]I refer to all three officers collectively as "the Officers."

Officers Ornelas and Jones began discussing where on Brooks's body they should use the Taser. Up to this point, Brooks's car was still running, but now Officer Ornelas reached inside, turned off the ignition, and dropped the keys on the floorboard. Brooks continued to refuse to get out of the car: she gripped the steering wheel, braced her legs against the floor, and yelled for help. Officer Ornelas pulled Brooks's left arm up behind her back and held it there while Officer Jones activated his Taser against her body three times: once on her thigh, once on her left arm, and once on her bare neck. While the voltage was inflicted Brooks was unable to get out of the car, as Officer Ornelas was still holding her arm behind her back. She experienced "tremendous pain," screamed for help, and, instinctively, honked her horn.

After using the Taser for the third time, the Officers dragged Brooks from her car and laid her on her stomach in the street. She continued yelling for help and told the Officers they were hurting her stomach. They held her down until they had handcuffed her; then they walked her to the patrol car and drove her to the police station.

The Taser left burn marks on Brooks's thigh, arm, and neck. She has scars on her thigh and upper arm. Her doctor has told her that the scar on her arm is likely permanent.

## II. Probable Cause

At the outset, I disagree with the majority's conclusion that the Officers had probable cause to place Brooks under custodial arrest. Whether Brooks's arrest was lawful has implications for both the federal Fourth Amendment excessive force inquiry and the question whether the Officers are entitled to qualified immunity from Brooks's state law claims.

First, the majority's assertion that the Officers had "clear authority for their initial *arrest* and detention of Brooks" is incorrect. Maj. op. at 4924 (emphasis added). The Officers

initially stopped Brooks for speeding in a school zone; that offense is a civil infraction. *See* Seattle Mun. Code § 11.52.100; Wash. Rev. Code §§ 46.61.440, 46.63.020. All the Officers had authority to do at that point was to "detain" Brooks "for a reasonable period of time necessary to identify [her], check for outstanding warrants, check the status of [her] license, insurance identification card, and the vehicle's registration, and complete and issue a notice of traffic infraction." Wash. Rev. Code § 46.61.021 (2004); *see also id.* § 46.63.060 (2004).

The majority's citation to Wash. Rev. Code § 46.64.015 in its discussion of Brooks's initial detention is thus misplaced. That section refers not to a "notice of traffic infraction" but to a "traffic citation and notice to appear in court," which a police officer may serve on a person who has committed a traffic violation "punishable as a misdemeanor or by imposition of a fine." *Id.*

In other words, the Officers did not have authority to arrest Brooks and serve her with a citation and notice to appear until she refused to sign the notice of infraction. Only then had she committed a misdemeanor. *See* Wash. Rev. Code §§ 46.61.022, 46.61.021 (2004). And even then, as the majority properly acknowledges, the Officers had no authority to take Brooks into *custodial* arrest. Rather, they were entitled to detain her only as long as "reasonably necessary to issue and serve a citation and notice," Wash. Rev. Code § 46.64.015 (2004) — which, according to Brooks, they never did.

Because the record, viewed in the light most favorable to Brooks, is bereft of facts to support a finding that the Officers had probable cause to place Brooks under custodial arrest, the majority, casting about for a theory, creates one from thin air: The majority maintains that there was probable cause to arrest Brooks for obstructing an officer. Brooks was never charged with obstructing an officer,[5] nor have the Officers ever sug-

---

[5]Brooks was charged with, but not convicted of, resisting arrest. The Officers did not have probable cause to arrest Brooks for that offense

gested that they had probable cause to arrest Brooks on that ground. Because the Officers never raised this theory in their briefs, Brooks has had no opportunity to dispute it. I would consider the question waived and not address it. *See Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007); *United States v. Williamson*, 439 F.3d 1125, 1138 (9th Cir. 2006).

In any event, the majority fails satisfactorily to explain how Brooks "obstructed" the Officers in the discharge of their powers or duties by refusing to sign the notice of infraction. *See* Wash. Rev. Code § 9A.76.020 (providing that "[a] person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties"). When they stopped Brooks for speeding in a school zone, the Officers were entitled "to identify [her], check for outstanding warrants, check the status of [her] license, insurance identification card, and the vehicle's registration, and complete and issue a notice of traffic infraction." Wash. Rev. Code § 46.61.021 (2004). Brooks's refusal to sign the notice of infraction — though a misdemeanor — did not prevent the Officers from accomplishing any of those tasks. The Officers were fully able to "complete and issue a notice of traffic infraction" without obtaining Brooks's signature. In fact, they did so, writing "File Direct" in the space provided for Brooks's signature. A refusal to provide a name or current address might have frustrated the Officers' attempt to issue a notice of infraction; the refusal to sign did not. The majority's attempt to elevate the misdemeanor of refusing to sign the notice to the gross misdemeanor of obstructing an officer is simply beyond the pale.

---

either: under Washington law, the crime of resisting arrest requires that the underlying arrest be lawful. *See* Wash. Rev. Code § 9A.76.040. If the Officers had no authority to take Brooks into custodial arrest to begin with, then they had no probable cause to arrest her for resisting arrest.

Nor does the majority point to any authority supporting its off-the-wall theory. The one case on the Washington obstructing-an-officer offense the majority cites is certainly no help. In *Lassiter v. City of Bremerton*, 556 F.3d 1049 (9th Cir. 2009), the police responded to a 911 call from a neighbor of Kenneth and Alpha Lassiter. The neighbor reported hearing Kenneth threaten to cut Alpha's throat, and other threats were audible on the 911 recording. When the officers arrived at the Lassiters' home, Alpha reluctantly answered the door, then lied and said no one else was home. The officers encountered Kenneth standing between the living room and kitchen, and they insisted he sit down so that they could investigate a possible assault. Kenneth repeatedly refused, and when an officer put his hand on Kenneth, "ostensibly to guide him to a chair," Kenneth reacted by grabbing the officer's arm. *Id.* at 1051. We held that the police had probable cause to arrest Kenneth for obstructing an officer because "[his] conduct made it impossible for the police to carry out their duty. More than just a momentary noncompliance with police orders, his conduct had the practical effect of precluding the officers from securing the scene and investigating a possible assault." *Id.* at 1053.

Brooks's behavior was in no way similar to Kenneth Lassiter's. Kenneth Lassiter repeatedly failed to obey the officers *and* physically interfered with the officers' attempt to require him to do so, "ma[king] it impossible" for them to carry out their duty. *Id.* Brooks initially cooperated with the Officers: she pulled over promptly and produced her driver's license when asked to do so. As a result, the Officers were able to carry out their duty of identifying her and issuing a notice of traffic infraction. Then she refused to sign the notice. That's it. There was noncompliance with a police request, but where is the "obstruction"?

Far more similar to Brooks's behavior, although considerably more colorable as an obstruction offense, is the behavior of the plaintiff in *Palmer v. Sanderson*, 9 F.3d 1433 (9th Cir.

1993). Palmer, stopped on suspicion of driving while intoxicated, submitted to two field sobriety tests, but then told the officer he was tired of taking tests and returned to his car. Palmer offered to answer questions in his car or to accompany the officer to the police station to take a breath test. We held that these facts, if credited, established that "no reasonable officer could believe there was probable cause to arrest Palmer for 'obstructing a public servant,' " because Palmer, though uncooperative, did not actually flee the scene. *Id.* at 1437.

The majority should have reached the same result here as in *Palmer*. Brooks stopped her car, she provided identification, and the Officers issued a notice of infraction. The failure to sign the notice no more prevented the Officers from carrying out their duty than did Palmer's refusal to cooperate further after taking two field sobriety tests.

In short, there was just no cause to arrest Brooks for obstructing an officer. None. That is probably why the Officers have never suggested that there was.

The majority also comes up with an alternative theory to justify the custodial arrest, also never argued by the Officers and so also waived, relying on *State v. Hehman*, 578 P.2d 527 (Wash. 1978). This approach is not a whit better on the merits than the majority's other creation.

*Hehman* held that custodial arrest is generally not proper for a minor traffic violation, *id.* at 529, but suggested that such an arrest might be permissible "when there are reasonable grounds to believe that the accused will refuse to respond to a citation." *Id.* at 528 (quoting ABA Standards Relating to Pretrial Release § 2.1 (Tent. Draft Mar. 1968)). In all three cases adopting that suggestion cited by the majority, including one unpublished decision by the Washington Court of Appeals, the person arrested failed to produce any identification and either did not own or did not claim to own the vehi-

cle he was driving. *See State v. Covington*, 144 Wash. App. 1012 (Wash. Ct. App. 2008) (unpublished); *State v. Jordan*, 747 P.2d 1096 (Wash. Ct. App. 1987); *State v. McIntosh*, 712 P.2d 319 (Wash. Ct. App. 1986). The Washington courts have never approved a custodial arrest for a non-arrestable offense where the driver, like Brooks, produced identification and owned the car she was driving. No case supports the majority's assertion that limited uncooperative behavior is enough to provide "reasonable grounds to believe that the accused will refuse to respond to a citation." *Hehman*, 578 P.2d at 528.

Here, Brooks's explanation for her refusal to sign was that she did not want to indicate she was guilty, not that she intended to ignore the ticket. And, given that the Officers had and recorded Brooks's name and address, there were no reasonable grounds for believing that the City would be unable to hold Brooks accountable for the infraction or misdemeanor. Thus, Washington's narrow exception to the usual preclusion of custodial arrest for a minor traffic violation does not apply, and the majority's conclusion that the Officers had probable cause to place Brooks under custodial arrest for the traffic violation itself is wrong.

The absence of probable cause to support a custodial arrest affects both the excessive force inquiry and the question whether the Officers are entitled to state qualified immunity.

## III. Excessive Force

Because I find the majority's excessive force analysis entirely unpersuasive at each turn, I revisit each step of the objective reasonableness inquiry under *Graham v. Connor*, beginning with "the nature and quality of the intrusion on [Brooks's] Fourth Amendment interests." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

## A.   Nature and Quality of Intrusion

I begin from the proposition that "[t]he three factors articu-
lated in *Graham*, and other factors bearing on the reasonable-
ness of a particular application of force, are not to be
considered in a vacuum but only in relation to the amount of
force used to effect a particular seizure." *Smith v. City of
Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (quoting *Chew v.
Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). The majority
acknowledges this court's determination in *Mattos v. Aga-
rano*, 590 F.3d 1082 (9th Cir. 2010) (per curiam), that a single
application of a Taser in drive-stun mode to the back of a sus-
pect's hand amounted to "a serious intrusion into the core of
the interests protected by the Fourth Amendment: the right to
be 'secure in [our] persons.' " *Id.* at 1087 (quoting U.S.
Const. amend IV). Nonetheless, the majority minimizes the
amount of force the Officers used against Brooks in two dif-
ferent ways: (1) it distinguishes between the Taser's two oper-
ating modes, the more commonly employed dart mode and
the drive-stun mode used in this case, and (2) it compares the
drive-stun mode to "pain-compliance techniques." Neither
consideration has anything to do with the factors that really
matter here: The force used was quite painful, and it left per-
manent scars.

As to the majority's first factor, we have held that Tasers
used in dart mode "constitute an intermediate, significant
level of force that must be justified by a strong government
interest that *compels* the employment of such force." *Bryan v.
McPherson*, 590 F.3d 767, 774-75 (9th Cir. 2009) (quoting
*Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d
1052, 1057 (9th Cir. 2003)) (internal quotations and brackets
omitted). The majority observes that using a Taser in drive-
stun mode does not cause the same neuromuscular incapacita-
tion that the dart mode produces. Noting that the Taser
deployment in *Bryan* caused the suspect to fall to the pave-
ment and shatter his teeth, the majority concludes that, "when
compared to the far more serious intrusion in *Bryan*, we find

the quantum of force here to be less than the intermediate." Maj. op. at 4932. But in *Mattos*, we characterized the single activation of a Taser in drive-stun mode as a "serious intrusion." And the Eighth Circuit in *Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009), held that a reasonable jury could find that a single application of a Taser in drive-stun mode to the arm of an individual suspected of committing a "minor, nonviolent crime[ ]" and who posed no "realistic threat to [the officer's] safety" constituted excessive force. *Id.* at 497-98. Although the court explained the difference between the dart and drive-stun modes, *id.* at 495 n.3, the distinction played no role in the court's excessive force analysis.

As to the majority's second factor, the majority minimizes the amount of force used in this case by equating it to "pain-compliance techniques," which it asserts "this court has found involve a 'less significant' intrusion upon an individual's personal security than most claims of force." Maj. op. at 4932 (quoting *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994)). The majority states, somewhat misleadingly, that "[t]he use of a Taser in drive-stun mode is considered a pain compliance technique . . . by . . . our jurisprudence." Maj. op. at 4932 n.14 (citing *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 969 n.8 (9th Cir. 2005)). But *San Jose Charter* did not distinguish between Taser modes or even mention the drive-stun mode; it simply noted that the officers in that case "did not bring with them any of the variety of non-lethal 'pain compliance' weapons used by police forces, such as tasers or stunbag shotguns." 402 F.3d at 969 n.8.

In fact, that footnote defeats the majority's suggestion that pain-compliance techniques are necessarily a "less significant" intrusion than most claims of force. The other pain-compliance weapon identified in the footnote, a stunbag shotgun, has been recognized by this court as capable of causing "grave physical injury." *Deorle*, 272 F.3d at 1279 (holding that "the degree of force used by [the officer] is permissible

only when a strong governmental interest compels the employment of such force," *id.* at 1280). Moreover, we have held that *Forrester* cannot be read so broadly as to apply to all so-called pain-compliance techniques:

> *Forrester* did not hold that pain compliance techniques are constitutionally permissible as a matter of law. Nor did it establish a rule of qualified immunity for the use of pain compliance techniques to arrest passively resisting misdemeanants. *Forrester* simply held that whether the use of [Orcutt Police Nonchakus, two sticks of wood connected at one end by a cord] as a pain compliance technique constituted excessive force was a question of fact that was properly submitted to the jury for its decision.

*Headwaters Forest Defense v. County of Humboldt* (*Headwaters I*), 240 F.3d 1185, 1201 (9th Cir. 2000), *vacated on other grounds*, 534 U.S. 801 (2001) (internal quotation omitted).

The majority's emphasis on placing a specific Taser mode in a predetermined category of degree of force for purposes of a *Graham* analysis is thus entirely wrongheaded. In short, "[r]ather than relying on broad characterizations, we must evaluate the nature of the specific force employed" on Brooks in this case. *Bryan*, 590 F.3d at 774; *see Deorle*, 272 F.3d at 1279 (considering the specific effects of the force used on the suspect as part of the quantum of force inquiry).

Doing so, I would conclude that the degree of force used on Brooks was significant. Before Officer Jones used his Taser on Brooks, Officer Ornelas pulled her left arm up behind her back and held it there. That "pain-compliance" hold prevented Brooks from complying with the Officers' subsequent demands that she get out of her car. While Brooks was thus immobilized, Officer Jones used his Taser on her three times: first he applied it to her thigh, then he "dug it into" her left arm, and finally he deployed it against her bare

neck. At least on the second and third uses, Officer Jones cycled the Taser through its full five-second cycle while Brooks screamed for help. Brooks experienced "tremendous pain," fear, and "shock." She began crying and instinctively honked her horn. The Officers then dragged Brooks from the car, laid her on her stomach in the street, and held her down while they handcuffed her, despite her protestations that she was pregnant and they were hurting her stomach. The Taser left burn marks on Brooks's thigh, shoulder, and neck. It also left scars, including a scar on her arm that is probably permanent.

In sum, the Officers inflicted a significant and frightening amount of force at a time when Brooks was already immobilized by a pain-compliance hold. The three *Graham* factors, and other factors bearing on reasonableness, must be considered in light of that force.

## B.   Governmental Interests at Stake

### 1.   *Severity of the Crime*

"The character of the offense is often an important consideration in determining whether the use of force was justified." *Deorle*, 272 F.3d at 1280. As the majority recognizes, for purposes of this appeal the only crime Brooks committed was the misdemeanor of refusing to sign the notice of infraction. Maj. op. at 4919 n.3. The majority acknowledges that that crime was not "serious." *Id.* at 4932. In fact, it was trivial. At the time, it was not an arrestable offense, and today, the signature requirement no longer exists. *See* 2006 Wash. Legis. Serv. Ch. 270 (H.B. 1650). This factor favors Brooks overwhelmingly.

Even if the majority is correct that there was probable cause to arrest Brooks for obstructing an officer, that crime, as committed by Brooks (if it was), was also minor. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007)

("Trespassing and obstructing a police officer, as those offenses were committed by [the suspect], are by no means such serious offenses as to provide an officer with a reasonable basis for subduing a person by the means employed by Officer Miller."); *Deorle*, 272 F.3d at 1281-82 (holding that "the crime being committed, if any, was minor" where the suspect "was charged with nothing more than obstructing the police in the performance of their duties").

This court has held that crimes significantly more severe than obstructing an officer do not justify the use of force against a suspect. In *Smith*, the suspect's wife called the police to report that he had physically abused her. Acknowledging "the seriousness and reprehensibility of domestic abuse," the court nonetheless held that "the circumstances are not such in this case as to warrant the conclusion that Smith was a particularly dangerous criminal or that his offense was especially egregious." *Smith*, 394 F.3d at 702-03. The court concluded that "the nature of the crime at issue provides little, if any, basis for the officers' use of physical force." *Id.* at 703. In comparison, Brooks was many fathoms from being a "dangerous criminal." She was not suspected of harming anyone at all, just of refusing to sign a piece of paper. The crimes she is alleged to have committed were trivial and provided no justification for the use of *any* force, let alone the significant force the Officers employed.

The majority points to *Mattos*, in which this court held that using a Taser against a woman charged with obstructing government operations did not constitute excessive force. *See* 590 F.3d at 1089. In *Mattos*, however, the police had responded to a domestic violence call, and the woman's actions prevented them from arresting her husband, who was "belligerent and appeared to be intoxicated." *Id.* at 1088. The court considered the situation particularly dangerous and noted that "more officers are killed or injured on domestic violence calls than on any other type of call." *Id.* (quoting *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005)). We acknowl-

edged that obstructing the officers was "not a serious crime," but also took into consideration the judgment that the woman's actions "carried the potential for a far more serious crime — assault on an officer." *Id.* Preventing officers from arresting another person who appears to pose some danger to them is a far cry from refusing to sign a traffic ticket. *Mattos* does nothing to suggest that Brooks's crime was anything but minor.

### 2. *Immediate Threat to the Safety of Others*

The "most important single element of the three [*Graham*] factors [is] whether the suspect poses an *immediate* threat to the safety of the officers or others." *Smith*, 394 F.3d at 702 (quoting *Chew*, 27 F.3d at 1441) (emphasis added). Had the majority applied this factor correctly, it is inconceivable that it would have determined that Brooks presented an "immediate threat." Instead, the majority excises the word "immediate" from the inquiry, departs from the record to speculate about actions Brooks *might* have taken, and concludes, rather inexplicably, that a mother driving her son to school did pose "some threat." Maj. op. at 4934. That is not true on this record and, in any event, under *Graham*, not enough.

The majority offers three reasons for its conclusion that Brooks posed "some threat." None is remotely convincing.

First, the majority suggests Brooks might have retrieved her car keys from the floorboard, where Officer Ornelas had dropped them, and "drive[n] off erratically." *Id.* at 4933. To begin with, it is very unlikely that Brooks, who was seven months pregnant and weighed over 240 pounds, was even capable of getting to her keys, restarting the ignition, and driving off before the Officers could stop her. Nor is there any indication whatever in the record that Brooks was inclined to flee. Had she been, she had ample opportunity to do so; instead, she provided identifying information when asked and waited while Officer Ornelas wrote a ticket.

Even if Brooks were somehow able to retrieve her keys and drive off, it is purely speculative to suggest that her driving might have been "erratic" and posed some threat to the Officers or others. This case is nothing like *Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003), in which the officer "was entitled to assume that [the suspect] posed an immediate threat," in part because the officer knew he "was a felony suspect wanted for the crime of attempting to flee from police by driving a car with a wanton or willful disregard for the lives . . . of others, . . . a crime that evinces a willingness to threaten others' safety in an attempt to escape responsibility for past crimes." *Id.* at 965 (internal citation omitted). Brooks was not a felony suspect, and she had never shown any propensity to flee from the police, whether "with a wanton or willful disregard for the lives of others" or otherwise. Moreover, the majority's imagined scenario certainly does not qualify as an "immediate threat," and the majority admits as much, stating that "it seems clear that Brooks was not going to be able to harm anyone with her car at a moment's notice." Maj. op. at 4933.

The stacked-up, unsubstantiated speculations that Brooks *might* have been able to retrieve the keys and *might* have decided to drive off (although she did not when she had the keys) and *might* have driven erratically if she did drive off and *might* have endangered people had she done so simply won't do as a basis for believing Brooks posed a danger to someone. Indeed, if Officer Ornelas really believed she was going to take off and endanger people, all he had to do was hold on to the keys rather than drop them in the car.

Second, the majority contends that Brooks posed a threat to the Officers' safety because she had refused to comply with their demands that she leave her car, and they were "unable to predict what type of noncompliance might come next." *Id.* at 4933-34. Like the earlier suggestion that Brooks might retrieve her keys and drive off erratically, the suggestion that she might engage in some unpredictable and dangerous act of

noncompliance is based on nothing. "The record does not reveal an articulable basis for believing that [Brooks] was armed or that [she] posed an immediate threat to anyone's safety." *Chew*, 27 F.3d at 1441. On the contrary, she had just dropped her son off at school, she was not suspected of any but the most trivial of crimes, she was unarmed, and she sat wedged in a car that was not running and in which she could not easily reach her keys. She had not harmed or threatened to harm anyone. Officer Ornelas had performed a warrant check and found that she was "all clear." Given all of that, there is just no evidence that Brooks posed *any* threat to *anyone's* safety, let alone an immediate threat — much less so, in fact, than in other cases in which we have held that there was no realistic danger to officers or others. *See Smith*, 394 F.3d at 702 (holding that, despite the suspect's agitation and his initial refusal to remove his hands from his pockets, "a rational jury could very well find that he did not, at any time, pose a danger to the officers or others" because there was "no indication in the record that . . . there was any reason to believe that he possessed any weapon," and he "made no threats, verbal or physical, toward [the officer] or anyone else"); *Deorle*, 272 F.3d at 1281-82 (concluding that "the danger to [the officer] and others appears to have been minimal" where the suspect was emotionally disturbed but "had discarded his crossbow . . . and carried only a bottle or a can" and "had not harmed or attempted to harm anyone"); *Chew*, 27 F.3d at 1442 (holding that a rational jury could "easily" find that a suspect who fled a traffic stop and hid in a scrap yard for ninety minutes but did not "engage[ ] in any threatening behavior during this time" "posed no *immediate* safety threat to anyone").

The majority cites Officer Jones's incident report, which recounts his assessment of the situation as "very dangerous." But "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281. Officer Jones says he was concerned because the car

was still running. But by the time Officer Jones used his Taser on Brooks, it was not running. Officer Ornelas had already taken the keys from the ignition and dropped them on the floorboard. The majority is unable to point to any objective factors to justify Officer Jones's perception that the situation was so dangerous that he needed to use his Taser — not once, but three times — on a pregnant woman ensconced in a car.

Finally, the majority relies, entirely inappropriately, on the Washington legislature's determination that obstructing an officer is an arrestable offense to conclude that "Brooks posed the sort of threat that it was appropriate to remove from the streets." Maj. op. at 4934. First, as I have already explained, Brooks was not even arguably guilty of obstructing an officer. Second, it cannot be the case that every person who obstructs an officer also "poses an immediate threat to the safety of the officers or others." *Smith*, 394 F.3d at 702. "[A]n officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts." *Deorle*, 272 F.3d at 1281. This court cannot judge whether a suspect posed an immediate threat to the safety of others simply by looking to whether she is suspected of an arrestable offense. Instead, there must be an "articulable basis" in the record for believing the suspect is not only a suspect but a dangerous one. *Chew*, 27 F.3d at 1441. In this case, it is clear there was no such basis, "articulable" or otherwise. Thus, this "most important" *Graham* factor weighs heavily in Brooks's favor. *Smith*, 394 F.3d at 702.

### 3. *Resistance to Arrest or Evading Arrest by Flight*

The third *Graham* factor is whether the suspect was "actively resisting arrest or attempting to evade arrest by flight." *Smith*, 394 F.3d at 701 (quoting *Graham*, 490 U.S. at 396). The majority begins by asserting that "the risk of flight . . . was present." Again, that is the wrong inquiry. The question is not whether Brooks might have been able to flee had she decided to try, but whether she *was* "attempting to evade

arrest by flight." *See Smith*, 394 F.3d at 703 ("Smith did not attempt to run from the officers."). It is clear from the record that she was not.

As to the question of resisting arrest, the majority is likely correct that Brooks's conduct would have been classified as "actively resistant" under the Seattle Police Department's Use of Force Training Guideline. The guideline defines an "actively resistant" suspect as one who "physically tenses his or her muscles and/or locks their arms and legs using resistive tension to avoid being controlled by the officer." Brooks does not dispute the Officers' report that she held on to the steering wheel and braced her legs against the floor to avoid being pulled from her car.

All told, however, Brooks's resistance was minimal. The majority misleads when it says she "employed force to defeat the Officers' attempts to control her." Maj. op. at 4934. Although she tensed her muscles to prevent her own body from being moved, she did not use force *against* the Officers. This level and type of resistance, if it weighs against a finding of excessive force at all, does so only slightly. *See Smith*, 394 F.3d at 702-03 (concluding that the suspect's resistance was not "particularly bellicose" because "he did not attack the officers," even though he "continually ignored the officers' requests to remove his hands from his pajamas and to place them on his head" and "shout[ed] expletives at the officers"); *see also Davis*, 478 F.3d at 1056 (holding that a suspect who was "somewhat uncooperative and resisted [the officer's] attempts to search his pockets" was not "actively resisting arrest").

## C. Totality of the Circumstances

An additional factor this court may consider in its *Graham* analysis is whether the Officers' conduct "violated applicable police standards." *Smith*, 394 F.3d at 703. This factor is particularly important in a case, like this one, in which there was

no probable cause to support a custodial arrest. According to the Seattle Police Department's Policy and Procedure Manual, an officer may "use only the minimal amount of force necessary to overcome physical aggression or resistance to compliance with *a lawful process*." (Emphasis added.) Also, nondeadly force is justified only when "necessarily used . . . [i]n the performance of a legal duty."

Officer Ornelas, testifying in Brooks's criminal trial, confirmed that departmental regulations prohibited taking Brooks into custody for refusing to sign the notice of infraction:

> PROSECUTOR: So, then just so I make sure I am clear then and to make sure I'm not misunderstanding, although she refused to sign the speeding ticket, which itself is a crime, you did not book her for that.
>
> ORNELAS: Correct, sir.
>
> PROSECUTOR: Could you within your discretion if you had wanted to at that point?
>
> ORNELAS: Do what, sir?
>
> PROSECUTOR: Arrest her for refusing to sign the speeding ticket —
>
> ORNELAS: No, sir.

Because the Officers knew they had no authority to effect a custodial arrest, they were not performing a legal duty and Brooks was not refusing to comply "with a lawful process." Under the Seattle Police Department's own policies, then, the Officers were not justified in using any force. The Officers' failure to comply with departmental standards is evidence a jury could rely on in deciding that the repeated use of a Taser — any Taser — on Brooks was unreasonable. *See Smith*, 394 F.3d at 703.

The court may also consider the availability of alternative methods of dealing with a suspect that adequately ensure that the suspect will be subject to conviction and punishment. *Cf. Smith*, 394 F.3d at 703. The majority rejects the district court's finding that there were "numerous other means of removing" Brooks from her car, characterizing that finding as "reflect[ing] after-the-fact speculation and fail[ing] to address what else these officers could have done in the situation that confronted them at that moment, when they needed to get the resistant Brooks out of the car to arrest her." Maj. op. at 4935. The flaw in the majority's reasoning is its underlying assumption: that the Officers "needed" to remove Brooks from her car.

Again, the Officers had no authority to effect a custodial arrest. They had already obtained Brooks's name and address on the notice of infraction, and there was no need to compel her to sign the notice. The Officers could simply make a notation indicating that Brooks had not signed — in fact, they did exactly that. The clear alternative open to the Officers in this case — and one infinitely more sensible than the route they chose — was to allow Brooks to go on her way.

Finally, the majority maintains that the Officers' decision, upon being informed of Brooks's pregnancy, "to employ a localized type of force away from her stomach . . . . mitigate[s] against a finding of excessive force." *Id.* at 4936. I fail to see how the majority could so conclude. The Officers could not have known how this woman who was seven months pregnant would respond, physically or psychologically, to the repeated application of thousands of volts of electricity to any part of her body. They could not be sure, for instance, that the pain and shock would not cause premature labor. *See* March of Dimes, Preterm Labor and Birth: A Serious Pregnancy Complication (April 2008), http://www.marchofdimes.com/pnhec/188_1080.asp (citing physical abuse and stress as risk factors for premature labor). Brooks's physical condition militates in favor of finding excessive force.

In sum, Brooks committed a trivial, nonviolent, and nonar-restable crime. There is no evidence that she posed any threat at all to the safety of the Officers or others. Her resistance was minimal and nonviolent and she was not attempting to flee. The Officers violated departmental standards by using force when they had no authority to effect a custodial arrest.

In these circumstances, no amount of force was justified. For "the essence of the *Graham* . . . analysis is that the *force* which was applied must be balanced against the *need* for that force: it is *the need for force* which is at the *heart* of the *Graham* factors. . . . [W]here there is no need for force, *any* force used is constitutionally unreasonable." *Headwaters I*, 240 F.3d at 1199 (internal quotations omitted). And, just as the Eighth Circuit held in *Brown* that a reasonable jury could find that a single application of a Taser in drive-stun mode to the arm of an individual suspected of committing a "minor, non-violent crime[ ]" and who posed no "realistic threat to [the officer's] safety" constituted excessive force, 574 F.3d at 498, so there is no question whatever that a reasonable jury could find that the repeated use of a Taser on a woman driving her son to school whose only crime was refusing to sign a notice of infraction was objectively unreasonable.

## D.   Qualified Immunity

Because I think it obvious that the Officers violated Brooks's constitutional right to be free from unreasonable sei-zure by using (grossly) excessive force on her, I reach the second step of the qualified immunity inquiry: whether the right violated was clearly established in a "particularized . . . sense." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on other grounds by Pearson v. Callahan*, 129 S. Ct. 808 (2009). The question is whether the Officers' "use of force was premised on a *reasonable* belief that such force was law-ful, or . . . 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confront-

ed.' " *Deorle*, 272 F.3d at 1285 (quoting *Saucier*, 533 U.S. at 202).

Contrary to the majority's suggestion, the relative scarcity of federal cases resolving excessive force claims arising from the use of Tasers does not preclude a denial of qualified immunity. "[N]otwithstanding the absence of direct precedent, the law may be, as it was here, clearly established. Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Deorle*, 272 F.3d at 1285-86 (internal citation omitted). When there is no case law directly on point, the question we must ask is "whether the state of the law at the time of the alleged wrong gave the defendants fair warning that their alleged treatment of the plaintiff was unconstitutional." *Davis*, 478 F.3d at 1056 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)) (internal quotations and brackets omitted).

Here, there is "no question that any reasonable officer would have known that the force used was excessive, from an elementary understanding of the obligations of law enforcement officers toward all individuals in the community they serve as well as from a review of the well-established law." *Davis*, 478 F.3d at 1056-57. This is not a close case. Any reasonable officer should have known that using a Taser repeatedly on a pregnant woman who had committed a trivial, nonviolent crime and who posed no realistic threat to the safety of others was unlawful. Even if the Officers did irrationally perceive some threat at the time (rather than developing a post-hoc explanation for their behavior), that would not suffice; a *reasonable* officer would not have seen any danger in the objective circumstances. And "a number of our cases . . . inform law enforcement officers of their obligation under the Constitution to refrain from the use of excessive force." *Id.* Just as *Brown*, 574 F.3d at 499, held that "[a]t the time [the officer] deployed his Taser and arrested [the plaintiff], the law

was sufficiently clear to inform a reasonable officer that it was unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety," so I would hold the law here sufficiently clear to inform the Officers that using a Taser, in any mode, to subdue Brooks was unconstitutional. *See Bryan*, 590 F.3d at 782 ("No reasonable officer confronting a situation where the need for force is at its lowest — where the target is a nonviolent, stationary misdemeanant twenty feet away — would have concluded that deploying intermediate force without warning was justified.").[6]

For these reasons, the Officers are not entitled to summary judgment on Brooks's § 1983 claim.

## IV.   State Qualified Immunity

Nor are the Officers entitled to qualified immunity from Brooks's state law claims. Under Washington law, qualified immunity is not available "for claims of assault and battery arising out of the use of excessive force to effectuate an arrest." *Staats v. Brown*, 991 P.2d 615, 627-28 (Wash. 2000). Even if there were no excessive force, however, I would still disagree with the majority's grant of state qualified immunity, because the Officers effected a custodial arrest in contravention of Washington law.

---

[6]Although the majority does not reach the second step of the qualified immunity inquiry, it notes that this court held in *Mattos* that "it would not have been clear to any reasonable officer on August 23, 2006, that use of a Taser in the situation they confronted was constitutionally impermissible." 590 F.3d at 1089. Again, however, the *Mattos* court focused on the domestic violence context in distinguishing *Bryan* and reaching its conclusion: "The officers used the Taser only once in a domestic violence situation that could have quickly become much more dangerous to everyone involved." *Id.* at 1090. Here, the Officers used the Taser multiple times in a situation utterly devoid of the indicators of dangerousness present in *Mattos*.

The standard for Washington state qualified immunity is different from the standard for qualified immunity under federal law. *See Staats*, 991 P.2d at 627. Under Washington law, an officer is entitled to qualified immunity from state law assault and battery claims only if the officer "(1) carries out a statutory duty, (2) according to procedures dictated to him by statute and superiors, and (3) acts reasonably." *Id.* (internal quotation omitted). An officer does not fulfill his statutory duty when he "consummate[s] the arrest contrary to existing court rule and statute." *Id.* Also, "an arrest amounting to a statutory violation [cannot] be 'reasonable.' " *Id.*

Applying these rules in *Staats*, the Washington Supreme Court denied state qualified immunity to a state fish and wildlife officer whose actions were similar to those of the Officers in this case. *Id.* at 626-28. The plaintiff in *Staats* refused to provide the defendant wildlife patrol officer with identification. After the "quite heated discussion" that followed Staats's refusal, the officer arrested him for "refusing to cooperate to receive a citation, contrary to former RCW 75.10.040 (1992)." *Id.* at 618. At that point, Staats "sidestepped and attempted to walk away" from the officer. *Id.* The officer then grabbed him and allegedly "slammed" him to the ground. The officer also purportedly "pulled Staats' ears straight out from his head causing extreme pain and suffering." *Id.* Staats was later charged with both "refus[ing] to give information to an officer performing his duties, contrary to former RCW 75.10.040," and "resisting arrest, contrary to RCW 9A.76.040." *Id.*

After reviewing the text of Wash. Rev. Code § 75.10.040 and the case law interpreting the statute, the court concluded that Staats's "arrest for refusal to provide identification" was unlawful because "(1) simply withholding information is not criminal resistance under [the] statute as a matter of law, and (2) [the officer] was not acting in discharge of a duty when he demanded information to support issuance of a citation he had no lawful authority to issue." *Id.* at 623. The court further

held that, because the officer had "consummated the arrest contrary to existing court rule and statute," he was not entitled to state qualified immunity. *Id.* at 627.

In this case, as I have explained, the relevant statutes did not permit the Officers to take Brooks into custody for refusing to sign the notice of infraction. Thus, the Officers "consummated the arrest contrary to existing . . . statute." *Id.* That statutory violation also made the Officers' conduct unreasonable. *See id.* Under Washington law, the Officers are not entitled to summary judgment on Brooks's state law claims.

## V.  Conclusion

For these reasons, I would affirm the district court's order denying summary judgment to the Officers. I respectfully dissent.