*809 WARDLAW, Circuit Judge,
joined by Judges PREGERSON, REINHARDT, and W. FLETCHER, concurring in the denial of rehearing en banc:
The panel paid the “require[d] careful attention to the facts and circumstances of [this] case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight,” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). We concluded that Officer Brian MacPherson used excessive force when, on July 24, 2005, he deployed his X26 taser in dart mode to apprehend Carl Bryan for a seatbelt infraction, where Bryan was obviously and noticeably unarmed, made no threatening statements or gestures, did not resist arrest or attempt to flee, but was standing inert twenty to twenty-five feet away from the officer. See Bryan v. MacPherson, 608 F.3d 614, 618 (9th Cir.2010). At the heart of our holding was the conclusion that the X26 taser and similar devices, when used in dart mode, constitute an “intermediate, significant level of force that must be justified by the governmental interest involved.” Id. at 622. We nonetheless concluded that Officer MacPherson was entitled to qualified immunity from Bryan’s 42 U.S.C. § 1983 suit, because this principle was not clearly established in 2005 when Officer MacPherson deployed his dart gun on Bryan. See id. at 629. A majority of the active judges of our court voted against rehearing en banc, and I concur.
The opinion accurately recites the factual record and we need not repeat it here. See id. at 618-19. Although the panel’s original opinion affirmed the district court’s denial of qualified immunity, Officer MacPherson and amici curiae League of California Cities and California State Association of Counties suggested we reconsider given that two other taser cases arising from incidents that occurred about the same time as Bryan’s tasing were pending in our circuit. We did so, and, although we did not alter our holding that Officer MacPherson used excessive force on Bryan, we concluded that, based on “recent statements [in other circuit opinions] regarding the use of tasers, and the dearth of prior authority,” a “reasonable officer in Officer MacPherson’s position could have made a reasonable mistake of law regarding the constitutionality of the taser use in the circumstances Officer MacPherson confronted in July 2005.” Id. at 629. After the panel filed its amended opinion, only Bryan petitioned for panel rehearing or rehearing en banc. Officer MacPherson opposed Bryan’s petition, arguing that the panel had correctly applied the law of qualified immunity. In other words, our current decision is a denial of Bryan’s — and not Officer MacPherson’s— petition for rehearing en banc.
After mischaracterizing the record, misstating our holding, and attacking our opinion for language it does not in fact *810 contain, Judge Tallman ultimately bases his dissent to our decision against rehearing en banc upon the largely unsupported and nonsensical belief that use of a device designed to fire a dart up to one-half inch into bare skin and deliver a 1200 volt charge somehow does not constitute an intermediate use of force. He cites no intra-circuit conflict created by our decision, but instead asserts that we erred by quoting binding circuit precedent. He cites no inter-circuit conflict created by our decision, but instead faults us for joining the growing national judicial consensus that tasers in dart mode constitute an intermediate level of force. More strikingly, he fails to tell the public that our court has simultaneously chosen to rehear the two other taser cases en banc — not because those opinions disagreed with the intermediate-level-of-force conclusion in Bryan, for they did not — but instead to reconsider how best to balance “the nature and quality of the intrusion on the individual’s Fourth Amendment interests” against “the countervailing governmental interests at stake” as required by Graham, 490 U.S. at 396, 109 S.Ct. 1865. See Brooks v. City of Seattle, 599 F.3d 1018 (9th Cir.2010), rehr’g en banc granted by 623 F.3d 911 (9th Cir.2010); Mattos v. Agarano, 590 F.3d 1082 (9th Cir.2010), rehr’g en banc granted by 625 F.3d 1132 (9th Cir.2010).[1]
I.
Our conclusion that use of the X26 taser and similar devices in dart mode constitutes an “intermediate, significant level of force that must be justified by the governmental interest involved,” Bryan, 608 F.3d at 622, falls well within the national mainstream of the decisions which have examined the nature and quality of the intrusion posed by tasers. Most recently, the Tenth Circuit (Judges Kelly, Brorby, and Gorsuch) concluded that the use of a taser gun like the one at issue here “against a nonviolent misdemeanant who appeared to pose no threat and who was given no warning” was unconstitutional excessive force under Graham, for which the officer did not enjoy qualified immunity. Cavanaugh v. Woods Cross City, 625 F.3d 661, 663-65 (10th Cir.2010). Citing our decision in Bryan, Judge Kelly wrote
Although Tasers may not constitute deadly force, their use unquestionably “seizes” the victim in an abrupt and violent manner. Accordingly, the “nature and quality” of the intrusion into the interests of Ms. Cavanaugh protected by the Fourth Amendment was quite severe.
Id. at *3. This follows upon numerous decisions agreeing that the use of tasers is at least an intermediate, if nonlethal, level of *811 force. See, e.g., Oliver v. Fiorino, 586 F.3d 898, 903 (11th Cir.2009) (recognizing that the taser is “designed to cause significant, uncontrollable muscle contractions”); Orem v. Rephann, 523 F.3d 442, 447-48 (4th Cir.2008) (rejecting the contention that a taser constitutes a minor or de minimus level of force); Hickey v. Reeder, 12 F.3d 754, 757 (8th Cir.1993) (“We find defendants’ attempt, on appeal, to minimize the pain of being shot with a stun gun ... to be completely baseless. The defendants’ own testimony reveals that a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless.”); Cavanaugh v. Woods Cross City, 2009 WL 4981591, at *5 (D.Utah Dec.14, 2009) (“The Graham factors in this case clearly cautioned against a significant use of force, such as the deployment of a taser.”); Crowell v. Kirkpatrick, 667 F.Supp.2d 391, 408 (D.Vt.2009) (recognizing that tasers have “been described by other courts as ‘moderate, non-lethal force’ ” and cause “acute — even severe— physical pain”); Orsak v. Metro. Airports Comm’n, 675 F.Supp.2d 944, 957-59 (D.Minn.2009); Cyrus v. Town of Mukwonago, 2009 WL 1110413, at *21 (E.D.Wis. April 24, 2009) (“The Court will view the use of a taser as an intermediate or medium, though not insignificant, quantum of force____”); Kaady v. City of Sandy, 2008 WL 5111101, at *16 (D.Or. Nov.26, 2008) (“I therefore conclude that use of a Taser constitutes an intermediate level of force and a significant intrusion on a victim’s Fourth Amendment rights.”); McDonald v. Pon, 2007 WL 4420936, at *2 (W.D.Wash. Dec.14, 2007) (“Taser use is considered an intermediate control tactic.”); Beaver v. City of Federal Way, 507 F.Supp.2d 1137, 1144 (W.D.Wash.2007) (“[T]he Court first finds that the use of a Taser constituted significant force.”); Parker v. City of South Portland, 2007 WL 1468658, at *22 (D.Me. May 18, 2007) (“In the circumstances, the Taser fairly can be characterized — as it has been by one court — as a significantly violent level of force.”); DeSalvo v. City of Collinsville, 2005 WL 2487829, at *4 (S.D.Ill. Oct.7, 2005). Indeed, Judge Tallman fails to cite a single case in any circuit or district court suggesting otherwise.
The growing national consensus that devices such as the X26 when used in dart mode constitute an intermediate level of force is also clearly reflected in national studies — including the one study that Judge Tallman cites in his dissent — and in the views of law enforcement professionals. See, e.g., William P. Bozeman et al, Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects, Annals of Emerg. Medicine, April 2009, at 480 (“Conducted electrical weapons are one of several intermediate force options available to officers faced with violent or combative suspects.”); id. at 485 (“Prevention of significant or fatal injuries is desirable and an important consideration in discussion of the safety of intermediate force options, including conducted electrical weapons.”).
Police research organizations also agree that tasers are at least an intermediate level of force. Canadian Police Research Centre, Review of Conducted Energy Devices 25(Aug. 22, 2005) (“[Controlled Electric Devices] are considered intermediate weapons in the North American, law enforcement, use of force vernacular.”), http://www.css.drdc-rddc.ge.ca/eprc/tr/tr2006-01.pdf; see also Merrick Bobb et. al., Police Assessment Resource Center, A Bad Night at Powell Library: The Events of November If, 2006, at 75 (“[T]he shock from a Taser constitutes a significant and painful use of force.... ”).
Tellingly, in a 2005 report on the use of tasers in seven selected law enforcement *812 agencies, the United States Government Accountability Office (GAO) found that six of the seven agencies permitted taser use only when situations had reached the third (“Volatile”) and fourth (“Harmful”) levels of the five-level FLETC (Federal Law Enforcement Training Center) Use-of-Force Continuum, which permit the use of “Compliance techniques” and “Defensive tactics” respectively. GAO., Taser Weapons: Use of Tasers by Selected, Law Enforcement Agencies, at 7-10 (May 2005), http://www. gao.gov/new.items/d05464.pdf. In other words, these six agencies classified tasers as intermediate levels of force. (Once a situation has reached the fifth (“Lethal”) level, officers are permitted to use deadly force in response. Id. at 8.)
II.
Because Officer MacPherson raised an interlocutory appeal to the district court’s denial of summary judgment on the basis of qualified immunity, we were bound by the procedural posture to view the facts in the light most favorable to the non-moving party (here Bryan), and then to ask “whether the officers’ actions are ‘objectively reasonable’ in light of the facts and circumstances confronting them.” Bryan, 608 F.3d at 620 (quoting Graham, 490 U.S. at 397, 109 S.Ct. 1865). In doing so, we remained “cognizant of the Supreme Court’s command to evaluate an officer’s actions ‘from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.’ ” Id. at 627-28(quoting Graham, 490 U.S. at 396, 109 S.Ct. 1865). We concluded that, even viewing the facts from Officer MacPherson’s perspective, the “intermediate level of force employed by Officer MacPherson against Bryan was excessive” in light of the facts that Bryan had complied with Officer MacPherson’s instructions to pull over based on a minor seatbelt infraction, never attempted to flee, was clearly unarmed, and was standing, without advancing in any direction, next to his vehicle, while Officer MacPherson was standing “approximately twenty feet away observing Bryan’s stationary, bizarre tantrum with his X26 drawn and charged.” Id. at 628. Judge Tallman quibbles with the facts on which we relied and claims that we incorrectly viewed those facts from Bryan’s perspective — but the sole example he offers of our supposed judicial astigmatism, our acceptance of the district court’s factual determination that “there was no clear indication” that Bryan heard or understood, is “categorically unreviewable on interlocutory appeal.” Eng v. Cooley, 552 F.3d 1062, 1067 (9th Cir.2009); see also Bryan v. McPherson, 2008 WL 904906, at *3 (S.D.Cal. Apr.3, 2008) (“While Plaintiff was apparently ignoring McPherson’s instructions, there was no clear indication he heard or understood the instructions .... ”).
III.
We based our holding that use of an X26 taser or similar device in dart mode — not, as Judge Tallman misleadingly suggests, the use of “all tasers” — constitutes an intermediate use of force on uncontested and uncontroversial descriptions in the record and in case law describing how tasers are designed to operate, rather than solely on the injury that Bryan himself suffered when he fell to the pavement and smashed his face and teeth. See, e.g., Bryan, 608 F.3d at 620 (citing Lewis v. Downey, 581 F.3d 467, 475 (7th Cir.2009); Draper v. Reynolds, 369 F.3d 1270, 1273 n. 3 (11th Cir.2004); Hickey v. Reeder, 12 F.3d 754, 757 (8th Cir.1993)). Indeed, one of the sources of our information on how the X26 taser functions was the manufacturer itself. See Taser Int’l, General Faqs, http:// www.taser.com/research/Pages/
*813 FAQGeneraLaspx. Taser International explains that its
TASER devices utilize compressed nitrogen to project two small probes up to various ranges ... at a speed of over 160 feet per second. These probes are connected to the TASER device by insulated wires. An electrical signal is transmitted through the wires to where the probes make contact with the body or clothing, resulting in an immediate loss of the person’s neuromuscular control and the ability to perform coordinated action for the duration of the impulse.
IV.
In concluding that Officer MacPherson used excessive force when he tased Bryan, we explicitly recognized and applied both the “settled principle that police officers need not employ the ‘least intrusive’ degree of force,” Bryan, 608 F.3d at 627 n. 15 (citing Gregory v. County of Maui, 523 F.3d 1103, 1107 (9th Cir.2008)), and the equally clear rule that “the presence of feasible alternatives is a factor to include in our analysis.” Id. at 627; see also, e.g., Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir.2005) (en banc); Headwaters Forest Def. v. County of Humboldt, 240 F.3d 1185, 1205 (9th Cir.2000), vacated and remanded on other grounds sub nom. County of Humboldt v. Headwaters Forest Def, 534 U.S. 801, 122 S.Ct. 24, 151 L.Ed.2d 1 (2001). We see no conflict between the rule that an officer need not use the least intrusive means in apprehending a suspect and the concept that there are nonetheless circumstances in which an officer who does not use the least intrusive means might use a level of force that cannot be justified. Judge Tallman’s only concern with the standard we applied is our cite to our nine-year-old decision in Deorle v. Rutherford, 272 F.3d 1272 (9th Cir.2001). Deorle in fact remains good law, in part because the Supreme Court denied certiorari.[2] We cited Deorle, along with other opinions, for the obvious principle that the use of force by law enforcement must be justified by an appropriate government interest. Judge Tallman specifically objects to the fact that now-withdrawn versions of our Bryan opinion quoted language from Deorle and Drummond with which he disagrees, but the amended opinion no longer relies upon the language to which he objects. It is puzzling, to say the least, that Judge Tail-man continues to rail against Bryan for something the opinion does not say.
V.
There is an obvious and critical distinction between concluding (as did one study cited by the dissent) that tasers cause “mild” (rather than “serious” or “fatal”) injuries on the one hand and suggesting that tasers cause no injuries on the other. See, e.g., Bozeman et al., supra, at tbl.5 (finding that injuries characterized as “mild” occur roughly a quarter of a time). Most of the “mild” injuries described in this study “were superficial puncture wounds” from the taser darts, but the fact that puncture wounds through the skin are classified as “superficial” rather than as “serious” or “life-threatening” does not mean that such wounds are insignificant. *814 In fact, such “superficial” barbed dart injuries have the potential to be quite significant. See, e.g., GAO, supra at 6-7(“If the barbs penetrate the skin, it is impossible to predict how deeply they will embed.... The manufacturer estimated that the barbs will generally penetrate bare skin no more than half an inch.”); National Institute of Justice, Study of Deaths Following Electro Muscular Disruption: Interim Report, at 3, http://www.ncjrs.gov/pdffiles l/nij/222981.pdf (June 2008) (“[Djarts may cause puncture wounds or burns. Puncture wounds to an eye by a barbed dart could lead to a loss in vision in the affected eye. Head injuries or fractures resulting from falls due to muscle incapacitation may occur.”). In this case, Bryan required emergency surgery to have the dart removed. Moreover, the sudden electrical charge that immobilizes an individual can cause significant injury, especially if the tasered individual, like Bryan, lands on a hard surface.[3] These injuries may even prove fatal, as Taser International’s own training materials warn: “The TASER conducted energy weapons cause temporary incapacitation and the inability to catch yourself as you fall. This incapacitation and the resulting fall can be dangerous and even fatal under specific circumstances. For example, someone hit by the X26 in a high place could be seriously injured in a fall....” Bryan v. MacPherson, No. 06-CV-01487 (S.D.Cal. Mar. 12, 2008) (Dkt 83^4, at 3) (emphasis added).
Such injuries, while perhaps “mild” in an abstract, relative sense, are clearly not insubstantial. Use of a device which can cause such injuries in the mine run of cases surely rises to the level of significant, intermediate force.
VI.
Judge Tallman claims that we have mischaracterized the facts, but it is Judge Tallman who has mischaracterized the evidence in the record in an attempt to minimize the quantum of force represented by use of an X26 taser or similar device in dart mode. For example, Judge Tallman says that “during training, nearly all Coronado Police Department officers are tased themselves.” In fact, the record demonstrates clearly that “[fit’s not a requirement” for Coronado officers to be tased before being certified — even though the vast majority in that department reportedly voluntarily were, albeit under highly-controlled circumstances.
The point is irrelevant in any event. The record shows only that Coronado police officers could volunteer to be tased by a taser deployed in drive stun mode while they were being held upright by two other officers. This is because, in the words of the Coronado Police Department trainer, “we don’t want them to fall down and hurt themselves in a training session.” This opportunity to submit to stungunning obviously has nothing to do with the question of whether an X26 taser in dart mode constitutes an intermediate level of force. Moreover, there is absolutely no evidence in the record that Officer MacPherson himself was ever tased in stun or dart mode; and, if there were, it would demonstrate that he was well aware of the substantial level of force he used on Bryan, as he would have been familiar with the loss of control (and inability to remain standing rather than crash to the ground) accompanying an electrical current running-through the body.
*815 Judge Tallman similarly misrepresents evidence in the record regarding the potential for injury the X26 or similar devices used in dart mode represents to those harpooned and tased. For example, he cites to Taser’s own Instructor Certification Lesson Plan from 2004, which makes the unsupported assertion that there is a “0% injury rate for the 26 watt ADVANCED TASER,” for the principle that these devices are entirely safe and innocuous. Notably, however, this same document begins with a warning that tasers “should be treated as serious weapons and should only be deployed in situations where the alternative would be to use other force measures which carry similar or higher degrees of risk.” More importantly, this warning includes an observation about exactly what constitutes an “injury” that casts serious doubt upon the usefulness of the “0% injury rate” figure: the “extensive medical evidence,” the document reads, “strongly supports the TASER X26 and ADVANCED TASER M26 and M18 will not cause lasting aftereffects or fatality....” In other words, in a study in which 1000 volunteers were tased — whether by tasers in drive-stun mode or in dart mode is not clear — none was killed or permanently injured. Fair enough — but surely it is possible for a weapon to cause injury, or even serious injury, without causing death or permanent injury.
VII.
We explicitly “recognize[d] the important role controlled electric devices like the Taser X26 can play in law enforcement” to “help protect police officers, bystanders, and suspects alike.” Bryan, 608 F.3d at 622. This recognition, however, which is shared by Judge Tallman, is entirely consistent with the eminently reasonable principle that the majority of active judges on our court, along with many other judges and law enforcement personnel, have also recognized: the X26 taser and similar devices, when used in dart mode, constitute an “intermediate, significant level of force that must be justified by the governmental interest involved.” Bryan, 608 F.3d at 622.
I respectfully concur with denial of rehearing en banc.

. In Brooks, Judges Hall and O'Scannlain properly distinguished tasers employed in stun mode as opposed to dart mode. Citing Bryan, the panel majority observed that a taser in "dart” mode is an intermediate level of force, and recognized that "[ojther circuit and district court decisions have also found the Taser dart application to be an intermediate amount of force.” Brooks, 599 F.3d at 1027 n. 13. In Mattos, the three-judge panel (Chief Judge Kozinski, Judge Bybee, and Judge Callahan), addressing the nature and quality of the intrusion resulting from use of a taser in dart mode, noted "[w]e are left with evidence that the Taser, in general, is more than a non-serious or trivial use of force but less than deadly force” and stated "we have no difficulty concluding that the Taser stun was a serious intrusion into the core of the interests protected by the Fourth Amendment: the right to be ‘secure in [our] persons.’ ” Mattos, 590 F.3d at 1087 (quoting U.S. Const, amend. IV). In neither decision did the panel find the use of force to be excessive, based upon consideration of the facts unique to each case, and the issue to be determined by the en banc panel is whether that assessment was correct. These appeals have been consolidated for rehearing on December 14, 2010.

. At the time Deorle was filed, a judge of our court sought but failed to secure rehearing en banc. See Deorle, 272 F.3d at 1274-75. The United States Supreme Court then denied Butte County Deputy Sheriff Greg Rutherford’s petition for certiorari. Rutherford v. Deorle, 536 U.S. 958, 122 S.Ct. 2660, 153 L.Ed.2d 835 (2002). Our court again voted against rehearing a decision that relied upon Deorle’s language, Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052 (9th Cir.2003), and the Supreme Court again denied certiorari. City of Anaheim v. Drummond ex rel. Drummond, 542 U.S. 918, 124 S.Ct. 2871, 159 L.Ed.2d 775 (2004).

. The similar use of the taser on Ms. Cavanaugh, “whose feet were on the front steps of her home,” caused her to go rigid, spin around, and strike her head on the concrete steps. Cavanaugh, 625 F.3d 661, 662. "As a result of this fall, Ms. Cavanaugh suffered a traumatic hrain injury.” Id. (emphasis added).