MURPHY, Circuit Judge,
concurring.
While I concur in the opinion of the court, I believe that law enforcement use of tasers merits further reflection. This case illustrates one kind of tragic result that can follow the employment of a taser. The developing law on taser use must consider the unique nature of this type of weapon and the increased potential for possibly lethal results created by newer models.
Our cases have reacted to a variety of circumstances where tasers have been used, and they sometimes reflect unexpected consequences. In Mahamed v. Anderson, 612 F.3d 1084, 1086 (8th Cir.2010), for example, a jailer used a taser on a screaming inmate lying on the floor of his own locked cell. The taser probes lodged in the inmate’s testicle and hand, assertedly causing long term impotence, incontinence, and nerve damage. Qualified immunity was denied the jailer in that case. Id. at 1087. An officer who tased a woman refusing to leave her car during a traffic stop was also denied qualified immunity. Brown v. City of Golden Valley, 574 F.3d 491, 499-500 (8th Cir.2009). A panel majority granted summary judgment in Cook v. City of Bella Villa, 582 F.3d 840, 849 (8th Cir.2009), to an officer who had tased an angry man approaching him while he was trying to arrest the man’s wife. Judge Shepherd dissented after concluding that it was unreasonable to “discharge [a] Taser simply because of insolence,” especially given the tremendous pain tasers cause. Id. at 859-60.
In deciding claims of excessive force, we balance “the nature and quality of the intrusion ... against the countervailing governmental interests at stake.” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); see Maj. Op. at .359. As we have previously observed, “case law related to the Taser is *362 [in the] developing” stage. Brown, 574 F.3d at 498 n. 5. While “the Taser, in general, is more than a non-serious or trivial use of force but less than deadly force ..., there is a lot of room between those end points.” Mattos v. Agarano, 590 F.3d 1082, 1087 (9th Cir.2010).
That the law is still evolving is illustrated in cases granting qualified immunity for that very reason. See, e.g., Bell v. Kansas City Police Dep’t, No. 08-456, at 4-5 (W.D.Mo. Mar. 22, 2010) (granting qualified immunity to police officer in “close case” because “there is not enough law warning defendant against tasering to justify this [excessive force] litigation”). Local law enforcement policies also reflect differing views of where the taser fits on the “force continuum.” Some allow taser use only as an alternative to deadly force, while others call for taser use whenever any force is justified. U.S. Gov’t Accountability Office, GAO-05-464 Taser Weapons: Use of Tasers by Selected Law Enforcement Agencies 9-10 (2005) (“GAO Report”).
Tasers fire metal probes into the skin, Brown, 574 F.3d at 495 n. 3, penetrating up to half an inch. Bryan v. MacPherson, 630 F.3d 805, 810 (9th Cir.2010) (Wardlaw, J., concurring). Connected by wires to the taser, the probes can deliver a 50,000 volt shock that lasts up to five seconds and causes “electrical muscular disruption.” Brown, 574 F.3d at 495 n. 3. Almost twenty years ago we described a taser shock as “a painful and frightening blow, which temporarily paralyzes the large muscles ..., rendering the victim helpless.” Hickey v. Reeder, 12 F.3d 754, 757 (8th Cir.1993). Hickey examined the older taser models, which already could cause “torment without marks” and paralyze local muscles. Id.
Although “one need not have personally endured a taser jolt to know the pain that must accompany it,” Lewis v. Downey, 581 F.3d 467, 475 (7th Cir.2009), the sensation of high voltage electrical shock is outside common experience and can easily be underestimated. Unlike other police weapons, tasers can be fatally confused with guns, which further distinguishes them from older technologies. See, e.g., Torres v. City of Madera, 655 F.Supp.2d 1109, 1118-19 (E.D.Cal.2009) (officer fatally shot suspect, intending to tase him); Henry v. Purnell, 619 F.3d 323, 327 (4th Cir.2010) (en banc pending) (officer shot suspect in elbow, intending to tase him). And especially with the newer tasers, the “nature and quality of [their] intrusion on the individual’s Fourth Amendment interests,” Graham, 490 U.S. at 396, 109 S.Ct. 1865, is somewhat unique in that they render even the most pain tolerant individuals utterly limp.
It appears that the Omaha Police Department has changed its position on tasers at least once in the past several years. It is not however clear from the record in which exact circumstances OPD policy would permit the use of a taser. The officers asserted in affidavits that departmental policies “authorize the use of Taser weapons to stop a suspect who is trying to flee,” Jt.App. 10, 16, and during an internal investigation the department’s taser coordinator did not question Pollreis’s use of a taser on a nonviolent suspect attempting to escape. Id. at 556. In contrast, the written policy in the record authorizes taser use on fleeing suspects only if they are “potentially dangerous or violent” or engaging in “active aggression” such as an assault. Id. 159, 330. This policy appears to have replaced a 2005 version, which was characterized by Omaha’s public safety auditor as “one of the [country’s] most liberal tasing policies” because it allowed taser use on nonviolent suspects who have not *363 attempted to flee.[3] Id. 616.
The OPD materials in the record contain very little about incidents similar to the one here, where James Barnes suffered fatal injuries after receiving a taser shock, then falling through an upper window and onto the ground. OPD’s safety auditor had earlier suggested that the department adopt a model rule developed by the International Association of Chiefs of Police (IACP) which prohibits taser use “in any environment where the subject’s fall could reasonably result in death.” Jt.App. 620 & n.28.[4] Apparently that rule was never adopted by OPD. Instead, the training materials warn in small type, amid many pages featuring bold print and graphics, that officers “should consider” the risk of falling, since after tasing “the major muscles are locked” and render one “[unjable to break the fall.” Jt.App. 311. They do not forbid taser use when falling poses a risk, however, or explain how to recognize such risky situations.
Since the record does not show that the OPD policies were “adopted with ‘deliberate indifference’ to [their] known or obvious consequences,” Moyle v. Anderson, 571 F.3d 814, 817-18 (8th Cir.2009), they cannot sustain McKenney’s § 1983 claim against the city of Omaha. Nevertheless, law enforcement agencies would be well advised to address their potential liability from posttasing falls, both by rulemaking and by training. As many as thirteen percent of taser targets are injured by falls. See Michael R. Smith et al., The Impact of Conducted Energy Devices and Other Types of Force and Resistance on Officer and Suspect Injuries, 30 Policing: Int’l J. Police Strategies & Mgmt. 423, 428 (2007). It appears the majority of law enforcement agencies (and OPD) rely to some extent on training by manufacturer Taser, International, which claims a “0% injury rate” for the taser model used on Barnes. Bryan v. MacPherson, 630 F.3d 805, 815 (9th Cir.2010) (Wardlaw, J., concurring); GAO Report at 11-12.
The unique effects of newer tasers, which cause both pain and full body paralysis, were considered by the Ninth Circuit in Bryan. The court rejected the notion that “because the taser results only in the ‘temporary’ infliction of pain, it constitutes a nonintrusive level of force.” 630 F.3d at 825. Rather, tasers’
physiological effects, ... high levels of pain, and foreseeable risk of physical injury [make tasers] a greater intrusion than other non-lethal methods of force.... The pain is intense, is felt throughout the body, and ... effectively commandeer[s] the victim’s muscles and nerves.... Moreover, tasering [may cause] serious injuries when intense pain and loss of muscle control cause a sudden and uncontrolled falls.[5]
*364 The [taser] thus intrudes upon the victim’s physiological functions and physical integrity in a way that other non-lethal uses of force do not.
630 F.3d at 825 (internal citations omitted).
The Bryan court also concluded that tasers “used in dart-mode constitute an intermediate, significant level of force that must be justified by the government interest involved.” The court differentiated tasers used in “drive-stun” mode, where an officer presses electrical nodes against a person’s body, from using a taser to fire metal darts into the body. Id. at 826. Both modes cause incapacitating pain, but only darts paralyze the entire body. Jt. App. 84.
In this case Officer Pollreis used her taser’s dart mode on James Barnes when she perceived that he might try to escape out a window. The taser’s two metal probes lodged in his lower back. The weapon then did exactly what it was designed to do: it completely incapacitated Barnes’s entire body. Instead of falling to the floor as Pollreis expected, Barnes smashed through the window and over the porch and fell onto the ground. The taser’s paralyzing effect apparently made Barnes unable to break his fall, and he died of massive brain trauma a few days later. Even though the officers were serving only misdemeanor warrants, Pollreis was faced with “circumstances that [were] tense, uncertain, and rapidly evolving,” Graham, 490 U.S. at 397, 109 S.Ct. 1865, and she mistakenly believed she could stop Barnes safely. She was wrong.
Just as officers may use guns only against suspects posing a threat of serious physical harm, Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the use of tasers requires sufficient justification for their use to be reasonable. The Supreme Court refused to let “police technology ... erode the privacy guaranteed by the Fourth Amendment” in Kyllo v. United States, 533 U.S. 27, 34, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), and the particular factual circumstances in which a taser has been used must be examined in the context of Fourth Amendment protections against excessive force.

. The auditor was fired in 2006 shortly after publishing a report that complained of "harsh and poor policing tactics in communities of color.” Bonn v. City of Omaha, 623 F.3d 587, 589 (8th Cir.2010).

. IACP has also posed several questions deserving police departments’ consideration, including: Should police use tasers on any or all fleeing suspects? Should police use tasers to compel compliance or only for defense? When, if ever, are multiple shocks allowed? Should police use tasers on the mentally disabled, children, the elderly, or the pregnant? International Association of Chiefs of Police, Electro-Muscular Disruption Technology: A Nine-Step Strategy for Effective Deployment 14 (2008).The adequacy of the manufacturer representations about taser use should also be considered when setting departmental standards.

. In Bryan, an officer tased a young man in boxer shorts from twenty feet away. Id. at 822. The man fell face down; the asphalt cracked four teeth and drove in a taser probe so deeply it needed surgical removal. Id. at 812, 814 (Wardlaw, J., concurring). See also *364 Cavanaugh v. Woods Cross City, 625 F.3d 661, 663 (10th Cir.2010) (taser victim suffered traumatic brain injury after falling onto concrete steps).