FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| KRISH SINGH, | No. 23-15356 |
| *Plaintiff-Appellant*, | D.C. No. 2:21-cv-00099-JJT |
| v. | |
| CITY OF PHOENIX; BRITTANY SMITH-PETERSEN, Officer, Badge No. 10529, wife; SMITH-PETERSEN, First Name Unknown, husband; ANNIE BATWAY, Officer, Badge No. 9656, wife; BATWAY, First Name Unknown, husband; UNKNOWN PARTIES, named as John and Jane Does I-X, | OPINION |
| *Defendants-Appellees*. | |

| | |
|---|---|
| KRISH SINGH, | No. 23-15444 |
| *Plaintiff-Appellee*, | D.C. No. 2:21-cv-00099-JJT |
| v. | |
| CITY OF PHOENIX; BRITTANY SMITH-PETERSEN, Officer, Badge | |

No. 10529, wife; ANNIE BATWAY,
Officer, Badge No. 9656, wife,

*Defendants-Appellants*,

 and

SMITH-PETERSEN, First Name
Unknown, husband; BATWAY, First
Name Unknown, husband;
UNKNOWN PARTIES, named as
John and Jane Does I-X,

*Defendants*.

Appeal from the United States District Court
for the District of Arizona
John Joseph Tuchi, District Judge, Presiding

Argued and Submitted May 17, 2024
Phoenix, Arizona

Filed December 26, 2024

Before:  Susan P. Graber, Roopali H. Desai, and Ana de
Alba, Circuit Judges.

Opinion by Judge Graber

# SUMMARY[*]

## Qualified Immunity/Excessive Force

The panel (1) reversed the district court's summary judgment for City of Phoenix police officer Brittany Smith-Petersen on Krish Singh's 42 U.S.C. § 1983 excessive force claim; (2) reversed the district court's order remanding Singh's state law claims to state court; and (3) dismissed Smith-Petersen's cross-appeal for lack of jurisdiction.

Smith-Petersen and another police officer responded to a report of an attempted robbery with a knife. When they arrived, Singh held a knife to his own neck and asked the officers to shoot and kill him. He refused to drop the knife, and Smith-Petersen shot and seriously injured him. The district court held that although a reasonable jury could find that Smith-Petersen violated Singh's constitutional right, she was nevertheless protected by qualified immunity from Singh's 42 U.S.C. § 1983 suit because there was no clearly established law that would have put her on notice that her force was objectively unreasonable under the circumstances. The district court remanded the state claims to state court for resolution.

The panel agreed with the district court's holding, not challenged on appeal, that Singh established a plausible, although not conclusive, constitutional violation at step one of the qualified immunity analysis. At step two—in which plaintiff bears the burden of showing that the rights allegedly violated were clearly established—the panel held that *Glenn*

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

*v. Washington County*, 673 F.3d 864 (9th Cir. 2011), involving materially similar facts, put Smith-Petersen on notice that her use of deadly force plausibly violated Singh's right to be free from excessive force. Here as in *Glenn*, (1) plaintiff did not brandish a knife but rather held it to his own neck; (2) despite failing to comply with commands to drop the knife, a number of circumstances weighed against deeming plaintiff an immediate threat; (3) the offense here—attempted robbery with a knife—was less serious than in *Glenn*; (4) plaintiff did not actively resist arrest; (5) officers should have been aware that plaintiff was emotionally disturbed; and (6) no effective warning was given. Finally, the question of whether Smith-Petersen could have used less intrusive means of force was better suited to resolution by the trier of fact.

The panel held that it lacked jurisdiction over Smith-Petersen's cross-appeal challenging the district court's determination that genuine factual disputes existed as to whether her use of deadly force was reasonable. The panel reversed the dismissal of the state-law claims and remanded for reconsideration of whether supplemental jurisdiction over the claims should be exercised.

---

**COUNSEL**

David L. Abney (argued), Ahwatukee Legal Office, PC, Phoenix, Arizona; J. Scott Halverson, Law Offices of J. Scott Halverson PC, Tempe, Arizona; for Plaintiff-Appellant.

Ashley Caballero-Daltrey (argued), Justin M. Ackerman, and John T. Masterson, Jones Skelton & Hochuli PLC, Phoenix, Arizona, for Defendants-Appellees.

**OPINION**

GRABER, Circuit Judge:

Plaintiff Krish Singh was shot and seriously injured by Defendant Officer Brittany Smith-Petersen in Phoenix, Arizona. Smith-Petersen and another Defendant, Officer Annie Batway, had responded to a report of an attempted robbery with a knife. When the two police officers arrived, Plaintiff held a knife to his neck and asked the officers to shoot and kill him. Plaintiff refused to drop the knife, and Smith-Petersen shot him. Plaintiff sued the City of Phoenix, Smith-Petersen, and Batway. The district court entered summary judgment for Defendant Smith-Petersen on Plaintiff's claim of excessive force, brought under § 1983, holding that she was protected by qualified immunity, and the court remanded Plaintiff's state claims to state court for resolution. We reverse and remand with respect to the appeal, and we dismiss Smith-Petersen's cross-appeal for lack of jurisdiction.

FACTUAL AND PROCEDURAL BACKGROUND

On November 11, 2019, Brittany Smith-Petersen and Annie Batway, who were police officers with the Phoenix Police Department, responded to a report of an attempted armed robbery at a Home Depot in Phoenix, Arizona. Before the officers arrived at the scene, the dispatcher informed them that the person who had reported the incident stated that the suspect was trying to rob him with a knife. In an updated report, the officers were told that the suspect was chasing the victim with a knife in a parking lot. The officers arrived at the scene at the same time, but in separate patrol vehicles. They saw Plaintiff walking through a Carl's Jr.'s parking lot; he was not chasing anyone.

The officers pulled their vehicles up on both sides of Plaintiff, forming an L-shaped configuration around him. While still in her patrol vehicle, Smith-Petersen directed Plaintiff to stop and to show both hands. Plaintiff was holding a knife against his own throat. Smith-Petersen got out of her patrol vehicle and ordered Plaintiff to "stay right there." She then drew her firearm, aimed it at Plaintiff, and yelled, "If you come any closer, I'll fucking shoot you." She told Batway to "get out of the way." She then told Plaintiff to "drop the fucking knife," while she moved around the back driver's side of her patrol car—placing her vehicle between her and Plaintiff. In response, Plaintiff said, "What? I'm going to die anyway." Smith-Petersen then told Plaintiff, "if you come any closer, I will kill you. Do you understand? Put the gun down." Plaintiff immediately corrected Smith-Petersen by saying something to the effect of, "it's a knife." In response, Smith-Petersen stated, "I'm sorry, you're right," and instructed Plaintiff to "put the knife down." For the remainder of the encounter, but before Smith-Petersen shot Plaintiff, Plaintiff made several statements, including that people thought he was "crazy" and that he wanted Smith-Petersen to shoot him. At no point did Plaintiff suggest that he intended to harm either of the officers or anyone else.

Approximately two minutes into the interaction, Plaintiff began to move slowly toward the corner of the front driver's side of Smith-Petersen's vehicle, which was positioned between the two of them. She moved backward in response, explaining that she did not want to shoot Plaintiff. Plaintiff said something to effect of, "I want to get shot." As Plaintiff slowly inched forward, Batway repeatedly told him to stop. He persisted, "Go ahead ma'am," and continued to move slowly toward Smith-Petersen. As he moved toward Smith-

Petersen, she continued to move backward, and Batway continued to tell Plaintiff to stop.  Plaintiff appeared to stop next to the front of the vehicle.  Smith-Petersen then fired a single round, striking Plaintiff in the abdomen.  Plaintiff fell to the ground and dropped the knife.  He survived his injuries.

In her deposition, Smith-Petersen testified that, at the time she shot Plaintiff, she believed that he posed a threat to her, to Batway, and to the public because he failed to comply with their repeated directions to drop the knife and continued to advance toward her.  She conceded that Plaintiff "did not make any specific sudden changes in movement to elicit [her] to fire [her] weapon sooner."  But, she explained, she fired her weapon "because [she] no longer had [a] barrier as well as Officer Batway never had a barrier."  Although both officers carried "OC spray"— akin to pepper spray—and a taser at the time of the incident, Smith-Petersen testified that she did not believe that it was safe to use a taser, because of the positions she and Batway were holding and because of "containment problems" due to the open parking lot.  She also testified that she did not feel that it would have been effective for her to have used the pepper spray or the taser, given the distance between her and Plaintiff.

In November 2020, Plaintiff sued Defendants in Arizona state court.  The complaint raised a single federal claim and three state claims:  (1) violation of the Fourth Amendment, under 42 U.S.C. § 1983, against Smith-Petersen only; (2) assault and battery, against the City and Smith-Petersen; (3) negligence and gross negligence, against all Defendants; and (4) negligent hiring, training, supervision, and retention, against the City.  Defendants removed the action to federal court.

After discovery, Defendants moved for summary judgment on each of Plaintiff's claims. The district court granted Defendants' motion only as to Plaintiff's claim under § 1983, holding that a reasonable jury could find that Smith-Petersen violated Plaintiff's constitutional rights, but she was nevertheless protected by qualified immunity. The court also remanded the remaining claims to state court. Plaintiff timely appeals, and Smith-Petersen timely cross-appeals, arguing that the district court's ruling that she violated Plaintiff's constitutional right will affect the resolution of the state claims.

## STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment on the basis of qualified immunity. Evans v. Skolnik, 997 F.3d 1060, 1064 (9th Cir. 2021). Many of the facts underlying this case are disputed. But, because we review the district court's grant of summary judgment to Smith-Petersen in these circumstances, we must construe all facts in the light most favorable to Plaintiff. Id. at 1063.

Jurisdictional questions are subject to de novo review. United States v. Jeremiah, 493 F.3d 1042, 1044 (9th Cir. 2007).

## DISCUSSION

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Taylor v. Barkes, 575 U.S. 822, 825 (2015) (per curiam) (citation and internal quotation marks omitted). In determining whether qualified immunity shields a police officer or other governmental official, we ask two questions: (1) "whether the facts that a plaintiff has

alleged . . . or shown . . . make out a violation of a constitutional right," and (2) if so, whether that right was "'clearly established' at the time of [the] defendant's alleged misconduct." Pearson v. Callahan, 555 U.S. 223, 232 (2009) (citations omitted). If the answer to either question is "no," the officer prevails and is immune from suit. See id. at 236.

A. Qualified Immunity

The district court held, and we agree, that Plaintiff has established a plausible, even though not conclusive, constitutional violation at step one of the qualified-immunity analysis. On appeal, Plaintiff challenges only the district court's holding at the second step of the analysis. At this step, Plaintiff "bears the burden of showing that the rights allegedly violated were clearly established." Shafer v. County of Santa Barbara, 868 F.3d 1110, 1118 (9th Cir. 2017) (citation and internal quotation marks omitted); see Pearson, 555 U.S. at 232.

The Supreme Court has held that the law is "clearly established" when "every reasonable official would have understood that what he is doing violates that right." Taylor, 575 U.S. at 825 (citation and internal quotation marks omitted). Although a case need not be "directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." Id. (citation and internal quotation marks omitted). The district court held that there was no clearly established law that would have put Smith-Petersen on notice that her force was objectively unreasonable in the circumstances. We disagree.

The facts in this case are closely akin to those in Glenn v. Washington County, 673 F.3d 864 (9th Cir. 2011), which sufficed to put Smith-Petersen on notice. In Glenn, the officers responded to a domestic dispute involving an

intoxicated and suicidal eighteen-year-old male ("Lukus"). Id. at 866.  In a 911 call requesting officer assistance, Lukus's mother described her son as being "out of control, busting [their] windows," "intoxicated," suicidal, and possessing a pocketknife with which he was threatening his parents.  Id. at 867.  Although the dispatcher neglected to share with the officers that Lukus's mother noted that Lukus had threatened them with the knife, the dispatcher did tell the officers that Lukus was "very intoxicated," that he "had broken a window and was out in the driveway," and that "there were hunting rifles inside the house."  Id.  When one of the officers asked whether "the Glenns could lock the doors since he '[didn't] want [Lukus] going inside if there are guns in [the house],'" the dispatcher responded that "Lukus had 'busted through the front door.'"  Id.

After arriving at the home and establishing a staging area that was a short distance from the Glenn home, the first responding officer, Deputy Mikhail Gerba, bypassed the staging area, where he encountered a friend of Lukus's, whom he ordered to "[g]et on the fucking ground."  Id. at 868 (brackets in original).  The friend complied, explaining that Lukus was "by the garage" and that "[they] [had] him calmed down."  Id.  Gerba proceeded to the driveway, positioning himself about eight to twelve feet from Lukus, who was holding the pocketknife to his own neck and was standing by his parents and another of his friends.  Id.  Gerba, from the moment he arrived, "'only scream[ed] commands loudly at Lukus' such as 'drop the knife or I'm going to kill you.'"  Id. (brackets in original).  But Lukus "may not have heard or understood these commands because he was intoxicated and many people were yelling at once."  Id.

Approximately four minutes after the first officer arrived at the scene, officers fatally shot Lukus, who was acting

erratically and, according to the responding officers, did not comply with their repeated orders to put down the pocketknife that he possessed.  Id. at 867–69.  Officers initially employed non-lethal force by shooting Lukus with beanbag rounds when he failed to comply with their orders.  Id. at 869.  But Lukus began moving toward the home in which his parents were located, and the officers then fatally shot him with live, lethal rounds.  Id.

The district court in Glenn entered summary judgment in the officers' favor, concluding that they were entitled to qualified immunity.  We reversed.  Id. at 866.

We concluded in Glenn that the officers' use of force was not undisputably reasonable because:  (1) although Lukus possessed a pocketknife, he "held [it] to his own neck" and never brandished or threatened anyone at the scene with it, id. at 873, 875–76; (2) even though Lukus did not respond to the officers' orders to put down the knife during the roughly three minutes that elapsed before they used the beanbag rounds, "a number of other circumstances weigh[ed] against deeming him 'an immediate threat to the safety of the officers or others,'" id. at 873 (citation omitted); (3) the "character of the offense" committed by Lukus was not severe because "[n]either the district court nor the defendants . . . identified any crime that Lukus committed," id. at 874; (4) Lukus may not have been actively resisting arrest, despite his failing to follow the officers' commands to put down the pocketknife,[1] id. at 875; (5) the officers

---

[1] Active resistance entails "pulling away from a deputy's grasp, attempting to escape, resisting or countering physical control or demonstrating the willingness to engage in combat by verbal challenges, threats, aggressive behavior, or assault."  Id. at 875 (brackets and internal quotation marks omitted).

were, or should have been, aware that Lukus was suicidal or otherwise mentally disturbed, which diminished the government's interest in using deadly force, id. at 875–76; (6) Lukus may not have comprehended the warnings and commands that the officers gave because he was intoxicated and there were other people yelling, id. at 876; and (7) less lethal alternatives, such as the use of a taser, may have been available, id. at 876–78.  Therefore, we held that "the district court erred in granting summary judgment on the constitutionality of the officers' use of force."  Id. at 878.

The facts in this case are similar to the facts in Glenn in all material respects:

First, Plaintiff and Lukus both held knives.  And, at the time of the encounter with officers, Plaintiff "did not brandish [the knife] at anyone, but rather held [it] to his own neck."[2]  Id. at 873.

Second, as in Glenn, despite Plaintiff's failure to comply with the officers' commands to drop the knife, "a number of

---

[2] For the first time at oral argument, Smith-Petersen argued that the position of the knife blade was "pointed toward the officers" and not toward Plaintiff, despite his keeping the knife at his neck during the encounter.  She argues that this factor enhanced the threat to the officers because Plaintiff could have "easily attack[ed] [the officers] rather than himself because the blade [was] already facing them."  The officers both attested that Plaintiff was holding the knife to his own neck in a way that would have made it easy for him to attack others.  But, before oral argument, neither officer detailed how the knife was positioned or held such that it increased the perceived threat.  Contrary to this newly raised characterization, from the available video evidence it appears that the knife blade may be pointed toward Plaintiff's neck (inward) and not in the direction of the officers.  Regardless, this distinction is not dispositive, in part because of the distance between Plaintiff and the officers.

other circumstances weigh against deeming him 'an immediate threat to the safety of the officers or others.'" Id. (citation omitted). In particular, the record supports findings that Plaintiff was suicidal, that he was "not in possession of any guns," that he was "not in a physical altercation with anyone," that he did not "threaten[] anyone with the knife, and [that] no one was trying to get away from him." Id. As in Glenn, Plaintiff "did not attack the officers . . . [nor] did he even threaten to attack any of them." Id. (citation and internal quotation marks omitted); see also Calonge v. City of San Jose, No. 22-16495, 2024 WL 2873371, at *8 (9th Cir. June 7, 2024) (noting that even though the suspect appeared to be carrying a gun, "he did not brandish his weapon or menace the officers; and he did not attempt to [access] . . . an area that could contain other people"). There was no other person in the open parking lot besides Plaintiff and the officers, "so a jury could conclude that no one was close enough to [Plaintiff] to be harmed by him before police could intervene." Id. at 874. Moreover, as we noted in Glenn and as the district court here suggested in its decision, a jury reasonably could conclude that the officers "could have moved farther away at any time, had they wanted to," undermining the notion that Plaintiff posed an immediate threat. Id.

Third, we have established "two slightly different ways" of assessing the seriousness of the offense in question. S.R. Nehad v. Browder, 929 F.3d 1125, 1136 (9th Cir. 2019). "[A] particular use of force would be more reasonable . . . when applied against a felony suspect than when applied against a person suspected of only a misdemeanor." Id.; see id. (explaining that cases involving a misdemeanor would "provide little, if any, basis for a use of deadly force"). Courts also may "use[] the severity of the

crime at issue as a proxy for the danger a suspect poses at the time force is applied." Id. (citing Smith v. City of Hemet, 394 F.3d 689, 702–03 (9th Cir. 2005) (en banc) (holding that "the nature of the crime at issue provid[ed] little, if any, basis" for the use of force where the suspect had physically assaulted his wife but was standing alone on his porch when officers arrived)).  Even when a suspect has made "felonious threats or committed a serious crime prior to [an officer's] arrival," however, a jury could discount the severity of the suspect's purported crimes when the suspect is "indisputably not engaged in [felonious] conduct when [the officer] arrive[s]." Id.

The officers in Glenn were responding to a domestic disturbance.  "Domestic violence situations are particularly dangerous because more officers are killed or injured on domestic violence calls than on any other type of call." George v. Morris, 736 F.3d 829, 839 (9th Cir. 2013) (quoting Mattos v. Agarano, 661 F.3d 433, 450 (9th Cir. 2011)) (internal quotation marks omitted).  In other words, the officers in Glenn had more reason to fear for their safety than Smith-Petersen did here.  It is true that the "legitimate escalation of an officer's concern about his or her safety is less salient when the domestic dispute is seemingly over by the time the officers begin their investigation." Id. (quoting Mattos, 661 F.3d at 450) (alteration adopted) (internal quotation marks omitted).  But the officers in Glenn arrived at the scene of the incident, the Glenns' home, where the domestic dispute was seemingly still active—that is, a domestic dispute involving a suicidal suspect armed with a knife.  See Glenn, 673 F.3d at 868 (noting that Gerba approached the driveway of the home and "positioned himself eight to twelve feet from Lukus, who was standing

by the garage near his parents" and was "holding the pocketknife to his own neck").

Here, the officers were responding to a report of an attempted robbery with a knife, a felony under Arizona law. Smith-Petersen argues that Plaintiff also violated other criminal statutes, which supported the use of deadly force. Those alleged violations may have been misdemeanors, which undercuts the use of deadly force. Browder, 929 F.3d at 1136; see also Ariz. Rev. Stat. §§ 13-1202(B) (specifying that "[t]hreatening or intimidating pursuant to subsection A, paragraph 1 or 2 is a class 1 misdemeanor"), 13-2508(B) (specifying that "[r]esisting arrest pursuant to subsection A, paragraph 3 of this section is a class 1 misdemeanor"). Because a reasonable jury could conclude that Plaintiff's conduct showed an intent to harm only himself, a jury also could find that Plaintiff's actions at the time of the officers' arrival did not constitute felonious conduct. In Glenn, the officers were dispatched to a domestic disturbance involving a "fight with a weapon" and were aware that Lukus had a pocketknife, that he was "intoxicated," and that he had "busted through the front door." Glenn, 673 F.3d at 867. The officers also knew that there were hunting rifles inside the house and, based on the information they were provided, that the Glenns could not lock the doors to prevent Lukus from going inside to retrieve the rifles.[3] Id. Even then, the officers in Glenn first used less lethal force before eventually shooting and killing Lukus. See id. at 869 (noting that one of the officers shot Lukus with all six of the shotgun's

---

[3] When notifying the dispatcher that the Glenns owned hunting rifles, Lukus's mother explained that "they were locked up and Lukus could not get to them." Glenn, 673 F.3d at 867. But that detail—that the hunting rifles were locked up—was not communicated to the officers when dispatched.

beanbag rounds before the officers employed the fatal rounds). Thus, the officers here arrived at a scene where a less serious crime was occurring than in Glenn.

Fourth, as in Glenn, Plaintiff did not actively resist arrest, despite his failing to comply with the officers' commands. Smith-Petersen does not contend that Plaintiff "tried to flee before officers shot him"; he "'did not attack the officers' or anyone else, nor did he threaten to do so at any point while officers were on the scene." Id. at 874–75 (distinguishing passive resistance from more "active" or "ominous" resistance) (quoting Smith, 394 F.3d at 703). In Smith, we held that the plaintiff's refusal to comply with the officers' commands to remove his hands from his pockets and place them on his head, his reentry into his home despite the officers' orders, and his brief refusal to place both hands behind his back were "not . . . particularly bellicose." 394 F.3d at 703. Similarly, in this case, "the crux of the resistance was the refusal to follow officers' commands, rather than actively attacking or threatening officers or others." Glenn, 673 F.3d at 875 (citing Smith, 394 F.3d at 703). Thus, viewing the facts in the light most favorable to Plaintiff, Plaintiff's conduct constituted less than active resistance, which did not warrant the use of deadly force. See id. (noting that "the defendants' own guidelines would characterize Lukus' conduct as less than active resistance, not warranting use of a beanbag shotgun").

Fifth, the officers "were or should have been aware that [Plaintiff] was emotionally disturbed." Id. at 875. The record strongly supports that Plaintiff was suicidal. Contrary to Smith-Petersen's suggestion that the relevant incident did not involve a suicidal suspect, Defendants' own expert concluded that Plaintiff was "threatening suicide" and acknowledged that "he was holding the knife to his own

throat." Moreover, when Smith-Petersen warned Plaintiff to "[s]tay right there, stop, if you come any closer I will fucking shoot you[,]" Plaintiff responded: "That's what I want."

Sixth, in Glenn we considered whether the officers had given an effective warning to Lukus. Id. at 876. We held that, even though the officers gave seemingly clear warnings to Lukus, Lukus "may not have heard or understood [the officers'] commands because he was intoxicated and many people were yelling at once." Id. at 868, 874 n.9. As in Glenn, Plaintiff "did not respond to officers' orders to put the knife down during the approximately [two minutes and fifteen seconds] that elapsed before he was shot." Id. at 873; see id. at 873–74 (noting that officers had shot Plaintiff with beanbags approximately three minutes after arriving and that they fatally shot Plaintiff less than four minutes after arriving).

As in Glenn, no effective warning was given to Plaintiff. Although Plaintiff heard and understood the officers' warnings, they had no effect on him given his mental state. He responded quite simply that he wanted the police to shoot him, emphasizing his suicidal state, so no warning could effectively convince him to change his behavior. Threatening a suspect with something that the suspect wants, in this case for Smith-Petersen to shoot and kill Plaintiff, is not a sufficient warning in these circumstances. See generally Bryan v. MacPherson, 630 F.3d 805, 829 (9th Cir. 2010) ("Although we have refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals, we have found that even when an emotionally disturbed individual is acting out and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted . . . with a mentally ill individual."

(quoting Deorle v. Rutherford, 272 F.3d 1272, 1283 (9th Cir. 2001)) (internal quotation marks omitted)); see also Deorle, 272 F.3d at 1283 (noting that "a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation" involving a a an emotionally distraught individual who is armed and dangerous "to a swift end").

Finally, in considering whether less intrusive means of force were available in this case, we agree with the district court that genuine disputes of fact exist. Smith-Petersen testified that she did not believe it was safe to use her taser or spray, given the positions she and Batway occupied. On the other hand, Plaintiff's expert opined that Smith-Petersen could have used less lethal options in the circumstances. Thus, the question whether Smith-Petersen could have used her taser, spray, or another less-lethal option before or instead of using deadly force, is better suited to resolution by the trier of fact. See Glenn, 673 F.3d at 878 ("[T]here was conflicting evidence on these points, so on summary judgment we must assume that a taser would have been a feasible option. Although a jury could ultimately disagree that the officers were in optimal taser range or that use of a taser was otherwise feasible or preferable, these are disputed questions of fact.").

The present case is readily distinguishable from Hart v. City of Redwood City, 99 F.4th 543 (9th Cir. 2024). The decedent in Hart was trying to commit suicide using a knife, and he already had cut himself by the time the police arrived at his home after his wife called for assistance. Id. at 545–46. During the incident, Hart "came towards [the officers] at a slow run [or a 'brisk walk'], holding the knife out towards the officers," and he moved from thirty to thirty-seven feet away to only eight to ten feet away from the officers in about 5.9 seconds. Id. at 546, 549. Indeed, Hart's

own expert testified that Hart posed an imminent threat to the officers. Id. at 551. By contrast, Plaintiff here never threatened or ran at the officers, as they conceded in their testimony; no less lethal methods were attempted; and Plaintiff's expert did not concede that Plaintiff posed an imminent threat.

Likewise, the present case is easily distinguished from two other recent opinions from this court. In Napouk v. Las Vegas Metropolitan Police Department, No. 23-15726, 2024 WL 5051193 (9th Cir. Dec. 10, 2024), the decedent held a large object that appeared to the officers to be a machete, id. at *2, whereas here the object was a small pocketknife. In Napouk, the decedent moved the object around and pointed it in various directions. Id. at *2–3, *6. By contrast, here, Plaintiff held the pocketknife only to his own throat. There, the decedent continually advanced on the officers, id. at *3, *6, and began to move more quickly toward them while telling them to "get out of here," id. at *3. In this case, Plaintiff said nothing aggressive, never moved quickly, and had stopped at the time he was shot.

Cuevas v. City of Tulare, 107 F.4th 894 (9th Cir. 2024), differs from this case even more markedly. In Cuevas, police attempted a traffic stop involving three suspects. Id. at 896–97. The suspects led police on a high-speed felony chase, involving an exchange of gunfire. Id. at 897. Here, Plaintiff was alone, was on foot, had no firearm, and did not attempt to flee.[4]

---

[4] Cuevas was argued and submitted on June 13, 2024, while this case was submitted earlier, on May 17, 2024. Accordingly, this case has priority under Ninth Circuit General Order 4.1(a), but we distinguish it for the sake of clarity in our case law.

Because we hold that <u>Glenn</u> put Smith-Petersen on notice that her use of deadly force plausibly violated Plaintiff's Fourth Amendment right to be free of excessive force, we need not and do not reach Plaintiff's alternative argument that this this case falls within the "obvious case" exception described in <u>Brosseau v. Haugen</u>, 543 U.S. 194, 199 (2004) (per curiam).

## B. <u>Jurisdiction Over the Cross-Appeal</u>

Considering our jurisdiction sua sponte, as we must, <u>Hajek v. Burlington N. R.R. Co.</u>, 186 F.3d 1105, 1107 (9th Cir. 1999), we lack jurisdiction over Smith-Petersen's cross-appeal. At the first step of the analysis, the district court ruled that genuine factual disputes existed, thus precluding a determination that Smith-Petersen's use of deadly force was reasonable as a matter of law, "because the disputed facts and inferences could support a verdict for either party." Although we have jurisdiction to resolve legal questions on appeal, "we lack jurisdiction to review a district court's conclusion that genuine factual disputes exist." <u>Sialoi v. City of San Diego</u>, 823 F.3d 1223, 1230 (9th Cir. 2016); <u>see</u> <u>Johnson v. Jones</u>, 515 U.S. 304, 313 (1995) (noting that appellants are "explicitly limited . . . to appeals challenging, not a district court's determination about what factual issues are 'genuine,' . . . but the purely legal issue [of] what law was 'clearly established'" (citations omitted)).

A party may nevertheless raise, on appeal, a legal argument that would trigger appellate jurisdiction.

> If the defendant argues only that the evidence is insufficient to raise a genuine issue of material fact, we lack jurisdiction. If the defendant's appeal raises purely legal

questions, however, . . . we may review those issues.  In other words, we have jurisdiction to review an issue of law determining entitlement to qualified immunity—even if the district court's summary judgment ruling also contains an evidence-sufficiency determination—but not to accede to a defendant's request that we review that evidence-sufficiency determination on appeal.

Est. of Anderson v. Marsh, 985 F.3d 726, 731 (9th Cir. 2021).  Here, Smith-Petersen does not challenge a legal conclusion that the district court made and does not argue that there was no Fourth Amendment violation even if all disputed facts are construed in Plaintiff's favor.  She merely "characteriz[es] [her] arguments as legal ones directed at the materiality of disputed facts," which we have held does not give rise to appellate jurisdiction.  Peck v. Montoya, 51 F.4th 877, 886–87 (9th Cir. 2022).

For example, Smith-Petersen challenges the district court's determination that there is a genuine factual dispute as to whether she could have continued to move back, away from Plaintiff, as Plaintiff moved toward her and whether Plaintiff stopped before he was shot.  She argues that those facts "are not material," because Plaintiff's "failure to heed [more than a dozen] lawful commands to stop and put down the knife made him a threat."  As another example, assessing the severity of the crime, Smith-Petersen argues that whether Plaintiff was actively threatening her and Batway with the knife is immaterial because it is undisputed that they were responding to a call of an attempted robbery with a knife.  But those arguments are "poorly disguised [efforts]" aimed

at arguing materiality—the true challenge being directed at the sufficiency of the evidence. Id. at 886. Therefore, we "must accept the district court's determinations that there are genuine disputes of fact and that a jury could find" that the facts favor Plaintiff. Id. at 887. Accordingly, we dismiss the cross-appeal for lack of jurisdiction.

## CONCLUSION

We reverse the district court's grant of summary judgment to Defendant Smtih-Petersen with respect to Plaintiff's § 1983 claim, reverse the dismissal of the state-law claims, and remand for further proceedings on the § 1983 claim and for reconsideration of whether to exercise supplemental jurisdiction over the state-law claims. We dismiss the cross-appeal.

**No. 23-15356, REVERSED AND REMANDED. No. 23-15444, DISMISSED.** Costs on appeal and cross-appeal are awarded to Plaintiff-Appellant.